**Application of Arthur E. MIDDLETON and Donald C. Reynolds.**

**Patent Appeal No. 7026.**

United States Court of Customs and Patent Appeals.

June 28, 1963.

50 CCPA

John R. Swindler, Edward S. Irons, Irons, Birch, Swindler & McKie, Washington, D. C., for appellants.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the examiner's rejection of claims 1 and 35 of appellants' patent application,[1] as barred by statute (35 U.S.C. § 102(b)) in view of two patents. Two claims have been allowed.

The invention relates to xerography, a process of recording light and shadow on a plate by means of electrostatic energy.

1. Serial No. 668,165 filed June 26, 1957, for "Photo-Active Member for Xerography."

The specification describes the xerographic process generally as follows:

"* * * [A] base plate of relatively low electrical resistance such as metal, paper, etc. having a photoconductive insulating surface thereon is electrostatically charged in the dark. The charged coating is then exposed to a light image. The charges leak off rapidly to the base plate in proportion to the intensity of light to which any given area is exposed. After such exposure the coating is contacted with electrostatic marking particles in the dark. These particles adhere to the areas where the electrostatic charges remain forming a powder image corresponding to the electrostatic image. The powder image can then be transferred to a sheet of transfer material resulting in a positive or negative print, as the case may be, having excellent detail and quality. Alternatively, where the base plate is relatively inexpensive, as of paper, it may be desirable to fix the power [sic] image directly to the plate itself."

The photoconductive insulating coating is an important feature of the process. The prior art photoconductive insulating materials were only slightly light sensitive in narrow areas of the visible light spectrum or else were very expensive, requiring highly involved and critical processes of preparation. The present invention involves the use of photoconductive insulating compounds which are dispersed in a high electrical resistance binder and coated on a base material. In defining the photoconductive insulating materials, the specification states:

"* * * In general, photoconductivity requires making electron transitions to the conduction band upon the absorption of light. There are certain definite physical properties generally associated with materials possessing this ability. While not all members of each class are necessarily photoconductive insulating compounds as described herein and, hence, operable in a xerographic binder plate, nevertheless, the physical properties constituting the distinguishing characterictics [sic] of the groups also constitute extrinsic evidence of photoconductivity. Hence, the photoconductive members of each group possessing the requisite resistivity as herein defined are photoconductive insulating compounds. Thus, the inorganic photoactive compounds operable in the instant invention may be classified in these groups: First, inorganic luminescent or phosphorescent compounds; Second, inorganic, intrinsically colored compounds having an index of refraction of at least 2, Third, inorganic compounds possessing at least one index of refraction greater than 2.10 over at least 5% of the wave-length range of visible light; and, Fourth, inorganic compounds which have two different valence states of at least one elemental constituent between which electron transfers can occur."

These four classes of compounds are described in detail in the specification and seventy examples employing the various photoconductive insulating materials are set forth. The claims recite that the materials used are "finely-divided particles of an inorganic photoconductive insulating metallic-ion containing crystalline compound" having light-activatable electrons. Claim 1 in its entirety reads:

"1. A process for recording a pattern of light and shadow comprising in the absence of activating radiation placing sensitizing electrostatic charges of one polarity on the surface of a xerographically sensitive member comprising a conductive backing and a thin photoconductive insulating layer thereon comprising an insulating organic resin binder and dispersed therein finely-divided particles of an inorganic photoconductive insulating metallic-ion containing crystalline compound having electrons in the non-conductive energy level activatable by illumination to a different energy level whereby

an electric charge is free to migrate under an applied electric field in the order of at least $10^3$ volts per cm., the composite resistivity of the layer being at least $10^{10}$ ohms-cm. in the absence of illumination and having a decay factor of less than 3.0, exposing the thus charged surface to a pattern of light and shadow to be recorded whereby an electrostatic latent image is formed corresponding to said pattern and depositing electrically attractable finely-divided marking material selectively in conformity with the electrostatic image thus produced."

The references relied on are:

| | | |
|---|---|---|
| Middleton | 2,663,636 | December 22, 1953 |
| Greig | 2,735,785 | February 21, 1956 |

The Middleton patent lists in the specification a number of particulate photoconductive insulators for use on xerographic plates, including zinc titanate, which is a photoconductor within the limitations of the claims on appeal. This patent claims only selenium, and not zinc titanate.

The Grieg patent teaches zinc oxide, a photoconductor within the limitations of the claims on appeal, used in a substantially similar process.

The Board of Appeals found each of these references to be a "statutory bar" under 35 U.S.C. § 102(b) because each describes the invention and each was patented more than one year prior to the filing date of the instant application.

It is appellants' contention that the present application is a continuation-in-part of copending parent application Serial No. 311,546 filed September 25, 1952 (hereinafter called the "linking application") which is, in turn, a continuation-in-part of the copending application which issued as the Middleton patent [2] relied upon by the Patent Office. The Middleton patent, they contend, discloses but does not claim an inorganic metallic-ion containing crystalline compound within the scope of the appealed claims, viz., zinc titanate. Inasmuch as the Middleton patent indicates that zinc titanate is the sole invention of Middleton and not the joint invention of Middleton and Reynolds, the present appellants, affidavits were filed purporting to comply with Rule 45 stating that the zinc titanate of the Middleton patent was the joint invention of appellants.

Appellants admit that the Middleton patent anticipates the appealed claims if it is available as a reference. They take issue, however, with the finding of the board that "there is an hiatus in the pendency in this Office of an application supporting claims to the broad concept of metal ion-containing crystalline, photoconductive materials between the patenting date of the Middleton patent, and the filing of the present application." The hiatus resulted, according to the board, because the linking application fails to support the broad claims but rather is "limited to phosphors or compounds having the crystalline structure or impurities of phosphors," which does not include "pure or pigment grade compounds, such as disclosed in the Middleton patent." There is no specific mention of zinc titanate in the linking application.

After the decision of the board was rendered, appellants filed an affidavit purporting to show that many of the inorganic compounds specified in the linking application are not ordinarily phosphors, but are photoconductive in pure or pigment grades. Two other affidavits were filed at the same time which centered about a letter between two patent attorneys, one of whom drafted the linking application, indicating the intended meaning of the terms used. The letter states:

"* * * the term 'phosphor' is a more limiting term than is desirable. The phosphor action itself is not vital to xerography. It would seem that a class which includes phosphors as well as photoconductors is the class of real interest. For want of a better name, the term

---

2. Issued from application Serial No. 95,374 filed May 25, 1949.

photo-active has been applied to this class."

These affidavits were filed with a Request for Reconsideration and a Request for Modification. The Request for Reconsideration stated that the linking application is generic to all photoconductive inorganic compounds of the type claimed and that claims equivalent in language and scope were present in the linking application for 8 years without challenge by the examiner as to the adequacy of disclosure to support the claims. Manifesting an abundance of caution, appellants asked for clarification of the first opinion in their Request for Modification "for the purpose of limiting the issues on appeal to the C.C.P.A. to those actually in controversy," citing In re Boyce, 144 F. 2d 896, 32 CCPA 718.

On reconsideration, the board stated: "We are not persuaded by these affidavits or by appellants' contentions that our interpretation of the disclosure in appellants' abandoned application Serial No. 311,546 was in error." To clarify its first opinion, the board stated: " * * * we do not regard as overruled 'all other grounds' which formed the basis of the rejection on the Middleton and Grieg [patents]," and agreed with the examiner that "it has not been satisfactorily established that the zinc titanate referred to in the Middleton patent was the joint invention of the present appellants," and that upon discovery that it was error to claim sole inventorship of zinc titanate in the Middleton patent, "there has not been established in this case the showing that correction of the error was diligently pursued."

A primary issue, as we see it, calls for the determination of whether or not the class of materials disclosed in the linking application for use as photo-active materials is limited to phosphors or compounds having the crystalline structure or impurities of phosphors.

The specification of the linking application, in material part, states:

"Now, in accordance with this invention, it has been found that a xerographic or electrophotographic sensitive member can be prepared with other photo-active crystals or crystalline materials tending to break up as molecules. For example, photo-active crystals having luminescent or phosphor properties generally undergo a change of energy with incident radiation, as evidenced by elevation of one or more electrons to a higher energy level whereby an electric charge is free to migrate under applied electric fields. Thus, the excited electrons or 'holes' left behind in such photo-active crystals, for example, in a binder may move through the coating under applied fields of the order of $10^3$ volts/cm. or larger in regions where light, X rays, ultraviolet, and such radiations are incident on the coating. Typical crystals possessing these properties are cadmium sulfide, zinc sulfide, lead sulfate, cadmium selenide, zinc selenide, mixed sulfides or selenides of these metals and other crystalline materials, sometimes available under the class of phosphors and believed to have activating crystal imperfections or impurities, such as amounts of other elements, for example, up to about 1% and generally about 0.001 to 0.01% of elements, such as copper, zinc, calcium, silver, magnesium, and the like."

Predicated on this disclosure appellants advance the argument that *all* photo-active crystals having activatable electrons which can move under an applied electric charge of at least $10^3$ volts/cm. are contemplated and that phosphors are but an *example* of such compounds. It is pointed out that the first sentence, without qualification centers its thrust on *photo-active crystals or crystalline materials,* making no reference to phosphorescence or to grade or purity; that the next sentence makes it clear that the reference to *luminescent or phosphor properties* is but an example of the generic class of *photo-active crystals* contemplated; that the next sentence, while embracing phosphors, directs its emphasis to the generic

invention which contemplates photo-active crystals and teaches that such crystals are *all* those which have electrons which may be excited and hence move under the designated applied field as required by the appealed claims and that the critical aspect is neither phosphorescence nor the grade or purity of the materials but the presence in the compounds of electrons activatable by light and which migrate under the defined field.

The final sentence of the quotation identifies, eo nomine, certain *typical* crystals. It is contended that the expression "these properties" refers not merely to phosphorescence but broadly to the "property" of possessing electrons of the character and function as specified in the appealed claims irrespective of whether or not such property embraces phosphorescence or the compounds are of pure or pigment grade and that the "typical crystals" identified are compounds which in their ordinary state are not phosphors.

After naming the allegedly normally nonphosphorescent crystalline compounds, the specification refers to *other* crystalline materials *sometimes* available under the class of phosphors. It is urged that this language pointedly draws a line of demarcation between phosphors and the ordinary nonphosphorescent, pure or pigment grade sulfides, selenides and sulfates disclosed.

The generic disclosure of the linking application is further amplified by the following paragraph:

"It is to be observed that there is a certain degree of similarity between the properties of photoconductivity, as required by the present invention, and phosphorescence or luminescence, as possessed by the commercial phosphors. In each case, it is presently believed that the desired property is imparted to the crystal by the presence of crystal imperfections which cause the presence of electrons in one energy level, which electrons can, by the action of light or suitable radiation, be raised to a higher energy level. In the case of the photoconductive material, such

as is employed in the present invention, the critical requirement or property is that the excited photoelectrons or holes left behind when under an applied electric field can migrate; presence or absence of a glow effect or luminescence is immaterial. It is believed that the characteristics and activity of the photoactive crystalline materials can be adequately explained by a development of this theory, but it is not intended to limit the invention to this or any other theory of operation."

It is to be observed that this paragraph refers to a certain degree of similarity between the properties of photoconductivity and phosphorescence or luminescence, while conveying, however, an obvious implication of distinction between the two classes. The expression "in each case" supports this implication. The similarity is predicated on the theory of function in that each by reason of the presence of crystal imperfections causing the presence of electrons in one energy level which can, by the action of light or radiation, be raised to a higher energy level, thus imparting the desired property to the crystal. It is further noted that the criticality of the presence or absence of a glow effect or luminescence is clearly and concisely disclaimed as immaterial. The critical requirement or property of the photoconductive material is that the excited photoelectrons or holes left behind when under an applied electric field can migrate. Thus, appellants reason that regardless of phosphorescence or grade or purity, the linking application expressly teaches that *all* inorganic compounds which satisfy the requirement to which the specification attaches criticality are useful in the claimed xerographic process.

With respect to the foregoing quotations from the linking application and appellants' contentions relative thereto, the board stated:

" * * * The recitation of physical characteristics of photo-activity does not broaden the area of the crystalline materials which are described.

Appellants have further referred to the paragraph beginning on line 3 of page 8 of the abandoned application Serial No. 311,546 as conclusive of what is referred to as an expressed disclaimer of any limitation to phosphors. While the statement that the 'presence or absence of a glow effect or luminescence is immaterial', upon which appellants rely, is included in the disclosure of the abandoned application, this statement itself is not seen to enlarge upon the class of materials embraced within the disclosure of the application to include pure or pigment grade metallic-ion containing compounds. Thus, the statement is preceded by what is regarded a property common to phosphors, that is, of the presence of crystal imperfections and impurities, this being the theoretical property relied upon in the abandoned application."

The board, in agreement with the examiner, held that the:

" * * * abandoned application does not afford such common subject matter, being limited to phosphors or compounds having the crystalline structure or impurities of phosphors."

The solicitor argues that it could not have been the intent of the linking application to refer to *all* crystalline materials which undergo a change of energy with incident radiation because that characteristic had already been recognized and exploited in other crystalline materials and that appellants would seem, in fact, to expressly disclaim any intention to embrace "all crystalline compounds" as evidenced by the statement that it had been found a xerographic sensitive member "can be prepared with *other* photo-active crystals." He reasons that reference to *other* carries the necessary implication that *some* are excluded, suggestively those already found useful in xerography.

As heretofore noted, the Middleton patent lists in the specification a number of particulate photoconductive insulators including zinc titanate but the patent claims only selenium. The continuation-in-part linking application could embrace a part of that portion of the disclosure of its parent not recited in the latter's patent claims. In our judgment, the linking application read in context does not support the above noted conclusions projected by the solicitor. It is pertinent to point out that both the examiner and the board recognized that the Middleton patent claims pose no obstacle to the patentability of the appealed claims.

The record shows by the affidavit of Wainer:

" * * * That by the term 'phosphor' is meant only materials characterized by a 'glow effect or luminescence' when excited by low energy photons; * * *."

The record affords no substantial refutation of the Wainer statement. It would seem logically to follow that if phosphorescence is immaterial in the linking application, it would border on credulity to conclude that the application is limited to phosphors.

As above noted, the linking application sets forth seventy examples employing the various photoconductive insulating materials. The solicitor asserts that in the application the appellants refer expressly to no compound which is said *not* to be a phosphor and that all compounds used in the examples are, "it seems clear," phosphors. He points out that in examples 1 and 2 the compounds are expressly disclosed as phosphors and that example 3 refers to use of a cadmium zinc sulfide crystal composition without expressly identifying it as a phosphor.

It would seem that the disclosure of a material by routine nomenclature would be sufficient without the necessity of stating that it is *not* something of a different character or nature. It would appear, however, as far as the record before us is concerned, that speculation and assumption relating to this phase of the matter would be laid at rest by the positive statement of the Wainer affidavit:

" * * * That the compounds 'cadmium sulfide, zinc sulfide, cadmium

selenide, zinc selenide and mixed sulfides or selenides of these metals' as disclosed in lines 33 and 34 of page 1 of Application Serial No. 311,546, are not phosphors in the pure form."

Appellants assert that claims embracing nonphosphorescent crystalline compounds in the precise terms employed by the appealed claims have been continuously urged before the Patent Office in Application Serial No. 311,546, and in the present application since September 25, 1952, and at no time during this period of almost eight years prior to the examiner's answer of June 7, 1961, did any Patent Office personnel ever suggest that the disclosure of the linking application was limited to phosphors. This matter was emphasized in appellants' Request for Reconsideration by the board.

The solicitor responds by pointing to the amendment of March 14, 1955, filed by appellants in the linking application more than two years prior to the filing of the application on appeal, citing language from the section entitled "Remarks" that "The claims have been amended and, as now drawn, clearly specify that the material is a phosphor." The solicitor argues that this amendment would seem to make it clear that appellants did not intend to claim or disclose materials other than phosphors and can, therefore, claim no benefit "from the failure of any examiner to raise the insufficiency of the disclosure" in the linking application.

The record, however, supports the argument of appellants that the claims "limited to specifically named chemical compounds" remained in the application after the amendment, not limited to the phosphor subgenus of such compounds, whereas other claims specifying like compounds were so limited. Examination of claims 16, 17 and 19 discloses each to be generic, respectively, to all zinc sulfide, zinc oxide and cadmium sulfide binder plates and while amended they were not limited to the phospor subgenus. Claim 15 which specified binder plates fabricated from a group of materials including zinc sulfide, zinc oxide and cadmium sulfide, was amended by the insertion of a limitation to the phosphor subgenus of such materials.

In view of the above, we find support of record for the conclusion that the appellants throughout the pendency of the linking application prosecuted concurrently claims directed both to chemical compounds generically and to the phosphor subgenus of the same compounds. The course thus pursued affords relevant and cogent proof in negation of the solicitor's argument that appellants seem to have made it clear that they did not intend to claim or disclose materials other than phosphors. It is a circumstance, at least, worthy of note and of some significance that no examiner at any time prior to the examiner's answer filed in the pending appeal ever suggested that the disclosure of the linking application was limited to phosphors.

■ Therefore, it is our conclusion that the linking application supports the claims on appeal and the instant case is a continuation-in-part of the linking application, as it purports to be, and is entitled to the benefit of its filing date of September 25, 1952.

The Grieg patent, which issued in 1953, is not a statutory bar under 35 U.S.C. § 102(b) once support for the claims is found in the linking application.

The board found the Greig patent to be a statutory bar because of the belief that the linking application is limited to phosphors, as noted above. However, the board found that appellants' affidavits under Rule 131 would "overcome the filing date of Greig in the absence of a statutory bar." Having found support in the linking application it follows that Greig is not available as a reference against the claims.

There remains the question of whether the Middleton patent is available as a reference against the claims. The application from which the Middleton patent issued was copending with the linking application of Middleton and Reynolds. The affidavits of Steinhilper and Mase were filed to show that the linking applica-

tion was filed in the joint names of Middleton and Reynolds in September 1952, after the realization in the summer of 1952 that the generic invention of photoconductive binder plates was their joint invention, rather than Middleton's alone.

Appellants filed affidavits to establish their joint invention of the use of zinc titanate in a xerographic plate. The board, on reconsideration, held "that it has not been satisfactorily established that the zinc titanate referred to in the Middleton patent was the joint invention of the present appellants." The solicitor states:

"* * * Appellants are entitled to the benefit of the filing date of the sole application which matured into the Middleton patent only if they have conformed with 35 U.S.C. 116, Rule 45, and Section 201.08 of the Manual of Patent Examining Procedure."

The affidavits were filed in July 1960. The requirements of the Manual of Patent Examining Procedure relied on by the solicitor were not then in effect. Section 201.06(c), cited by the solicitor, now provides that there must be filed in the new application the verified statement of facts required by Rule 45. The Manual in 1960 made no reference to the verified statement of facts. The 1960 version by which appellants were guided provided:

"(c) There must be filed in the new application a disclaimer under oath by the non-inventors of the divisible subject matter."

The board sustained the examiner's conclusion "that there has not been established * * * the showing that correction of the error was diligently pursued." The diligence requirement is not statutory, but apparently is inferred from the language of Rule 45 which is derived from 35 U.S.C. § 116. The statute provides:

"§ 116. Joint inventors

*    *    *    *    *    *

"Whenever a person is joined in an application for patent as joint inventor through error, or a joint inventor is not included in an applica-

tion through error, and such error arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes."

The terms prescribed by the Commissioner under the statute are:

"45. Joint inventors.

*    *    *    *    *    *

"(c) If an application for patent has been made through error and without any deceptive intention by less than all the actual joint inventors, the application may be amended to include all the joint inventors upon filing a statement of the facts verified by, and an oath as required by rule 65 executed by, all the actual joint inventors, provided the amendment is diligently made. Such amendments must have the written consent of any assignee."

The Manual of Patent Examining Procedure states:

"The filing of a new joint application to take the place of a sole application, subject to the provisions of the third paragraph of Rule 45, would be the equivalent of amending the sole application."

The solicitor takes the position that diligence in correcting the error is required in order to obtain the benefit of the filing date of the earlier filed application. He also urges that the examiner was correct in taking the position that the disclosure of only a single species, zinc titanate, in the Middleton patent does not support the instant generic claims. However, these issues raised by the solicitor need not be decided in this case because Middleton et al. do not need to obtain the benefit of the filing date of the Middleton patent. As noted, the Greig patent, the only reference relied on besides the Middleton patent, is unavailable against the appealed claims because of the Rule 131 affidavit. Appellants thus do not need to establish a date of invention against some other person or a reference of some other per-

**560**

son in order to prevail. They need only establish that the Middleton patent is not a proper reference against them.

We think appellants have demonstrated by their affidavits that they, rather than Middleton alone, are the inventors of zinc titanate disclosed in the Middleton patent. There seems to be no dispute that upon discovery of the fact of joint inventorship of the subject matter now claimed in the summer of 1952, the linking application was filed on September 25, 1952. In any event, we think the affidavits of Middleton and Reynolds clearly establish that zinc titanate was their joint invention and not that of Middleton alone. The only objection made to the proof of joint inventorship was that appellants did not show diligence in filing affidavits explaining the scope of the joint invention in the Middleton patent.

A similar situation to that here presented arose in Ex parte Lemieux, 1957 C.D. 47, 115 USPQ 148, where a prior published article by the inventor was used as a reference against his patent application. There the Board of Appeals, in holding the rejection improper, stated:

"There being no evidence of invention by anyone else prior to appellant's filing date, the date of appellant's invention is immaterial. In the present case, we are not concerned with appellant's 'date of invention' vis-a-vis the publication of another, an interferant, or another adverse party."

While this court declined to hold improper a rejection based on a foreign patent alleged to be of the same inventor in In re Saurer, 118 F.2d 719, 28 CCPA 1021, it was found there that it would require additional evidence to establish that the patent, taken out in the name of a company and not an inventor, was in fact a publication of an invention made by Saurer.

Here, on the other hand, it is apparent from the record that the disclosure of zinc titanate in the Middleton patent arose from the joint invention of appellants Middleton and Reynolds. Since the Middleton patent issued subsequent to their effective filing date, available to them by reason of the linking application, the Middleton patent is not available as a reference against them.

Therefore, the determination of this appeal does not require that we decide the issue of compliance with Rule 45 and the provisions of the Manual of Patent Examining Procedure, including the matter of diligence in acting to obtain the benefit of the filing date of the application which resulted in the Middleton patent. Moreover, it is not necessary to decide whether the disclosure of the patent supports the generic claims on appeal.

We hold that appellants are entitled to the filing date of the linking application which was copending with the Middleton patent and that the latter is not available as a reference against the claims on appeal.

For the foregoing reasons, the decision of the Board of Appeals is reversed.

Reversed.