SCM CORPORATION, a New York corporation, Plaintiff,

v.

RADIO CORPORATION OF AMERICA, a Delaware corporation, Defendant.

No. 65 Civ. 686.

United States District Court, S. D. New York.

Sept. 28, 1970.

Pennie, Edmonds, Morton, Taylor & Adams, New York City, for plaintiff; Frank F. Scheck, J. Philip Anderegg, Keith E. Mullenger, John L. Downing, Jerry Oppenheim, New York City, of counsel.

William K. Kerr, New York City, for defendant; David W. Plant, Paul L. Brown, Charles P. Baker, New York City, of counsel.

## OPINION

McLEAN, District Judge.

This is a patent suit which was begun on March 5, 1965. The complaint, which has been several times amended, in its present form contains three counts. In the first, plaintiff SCM Corporation (SCM) seeks a judgment declaring that each of three United States patents owned by defendant Radio Corporation of America (RCA), Patents Nos. 3,052,-539 (539), 3,052,540 (540), and 2,922,-883 (883) is invalid on various grounds and that SCM has not infringed them. In the second, SCM seeks recovery of the royalties which it paid to RCA during the time that SCM was a licensee under the 539 patent. SCM claims that RCA induced it to enter into the license agreement by fraud. In the third count, SCM charges that RCA procured the 539 patent by practicing fraud upon the Patent Office and that consequently, in asserting rights under that patent, RCA has violated Section 2 of the Sherman Act and has caused damage to SCM.

RCA has counterclaimed for a judgment determining that each of these patents is valid and that SCM has infringed each of them. RCA seeks an injunction against infringement and an accounting. A second counterclaim, in which RCA charged SCM with violating the antitrust laws in a variety of ways, was dismissed by this court on SCM's motion, SCM Corporation v. Radio Corporation of America, 276 F.Supp. 373 (S.D.N.Y. 1967). The order of dismissal was affirmed by the Court of Appeals, SCM Corporation v. Radio Corporation of America, 407 F.2d 166 (2d Cir. 1969), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969).

This opinion will first consider SCM's first count and RCA's counterclaim, i. e., the issues of validity and infringement of the three patents. It will deal with each patent separately. It will first treat the 539 patent, the most important of the three, to which the bulk of the evidence was directed.

### The 539 Patent

This patent is entitled "Electrostatic Printing." It was issued on September 4, 1962 to RCA as the assignee of the applicant, Harold G. Greig, a scientist employed by RCA. The original application for the patent was filed on September 29, 1951. This application was later abandoned and a continuation-in-part application was filed on October 1, 1953. In the approximately nine years which

intervened between the filing of the continuation-in-part and the issuance of the patent, there were many proceedings in the Patent Office, culminating in an action instituted by RCA against the Commissioner of Patents in the United States District Court for the District of Columbia. Some of these proceedings have an important bearing upon the issues to be decided here.

The patent relates to "office copying," i. e., the reproduction of documents. It contains twenty-two claims. Fifteen of these are process claims, i. e., claims devoted to the process or method of making copies of the documents to be reproduced. The remaining seven are product or "paper" claims, i. e., claims devoted to the "recording element" on which the copies are formed. This element consists of a specially coated paper. RCA's trade name for the process is Electrofax.

On June 17, 1963 (effective as of March 1, 1963) RCA granted to SCM a license under claims 1–13, 20 and 21 of the patent. These are all process claims. The agreement licensed SCM to make, use and sell "Electrofax Office Copiers in which, or in the operation of which, such Licensed Patent is used." The license agreement afforded SCM the right to terminate it after one year upon 30 days' notice. On March 4, 1965, SCM availed itself of this privilege and terminated the license. It began this action on the following day.

SCM contends that the 539 patent is invalid under 35 U.S.C. § 102, § 103 and § 112, that is to say, that it is anticipated by prior art, obvious to one having ordinary skill in the art, and inadequately described in the specification. SCM asserts that each of the 22 claims of the patent is invalid under each of these statutory provisions. Furthermore, SCM contends that each claim is invalid and unenforceable because RCA procured the patent by "fraudulent conduct in the United States Patent Office and the United States District Court for the District of Columbia."[1] Finally, SCM contends that each claim is unenforceable because RCA failed to grant a royalty-free license under the patent to the United States Government and because RCA has misused the patent by separately licensing and charging royalties to the manufacturers of copy machines and the manufacturers of copy paper.

The charges of fraud and the contention of invalidity under Section 112 because of inadequate description of the invention are closely related. More testimony was devoted to them than to any other subject. Understanding of the case will be enhanced by considering these contentions first. To that end it is necessary to set forth a chronological summary of the facts established by the evidence.

### Events Prior to the Filing of the Original Application on September 29, 1951

The story begins in the early 1940s. On October 6, 1942, United States Patent No. 2,297,691 was issued to Chester F. Carlson on "Electrophotography." This was the basic patent on a process for copying documents which subsequently became well known as "Xerography" or the "Xerox process."[2] The Haloid Company acquired the rights to this invention. In 1948 it employed Battelle Memorial Institute, a research organization in Columbus, Ohio, to do further research on it. Over a period of two years, from June 1948 to June 1950, Battelle engaged in extensive experimental and development work on this subject. It rendered quarterly reports to Haloid upon its activities and conclusions.

1. At the outset of this action, SCM's complaint did not contain its present claims of fraud. These claims, now made in all three counts, were added by amendment in May 1967.

2. Carlson secured at least four other patents pertaining to various aspects of Xerography. Some were issued before and some after 1942. Conceivably, some of these patents could also be said to be "basic." It is unnecessary for the purposes of this case to be precise about this.

RCA maintained research laboratories in Princeton, New Jersey, which were staffed with a sizable number of scientists and engineers working in a variety of fields. One section was known as the Acoustical and Electromechanical Research Laboratory. For many years, from 1942 to 1965, its head was Charles J. Young. Harold G. Greig, a chemist, was one of his group.

Young heard about Xerox in 1948. It interested him at once. One of the earliest documents in this case consists of some handwritten notes by Young made on February 4, 1949 and "Witnessed and understood" by Greig on February 7, 1949, in which Young jotted down questions "regarding extent of patent coverage obtained by Carlson, et al. on Xerography." [3]

Young visited Battelle and Haloid in October 1950. He was shown the work going on there in Xerography. His interest increased. Greig, presumably at Young's direction, made copies and abstracts from time to time of portions of Battelle's quarterly reports to Haloid to which he was granted access. On September 25, 1951, RCA took a license from Haloid under the patents relating to Xerography, including the five Carlson patents and four others issued to other persons.

It is apparent that Young and Greig were eager to devise a document copying process which, without infringing Carlson's patent, would afford RCA an opportunity to compete with Xerography in what promised to be a lucrative field. To comprehend their problem and to appreciate what they achieved, it is necessary to understand the Xerox process and the respects in which Greig's invention differed from it. This is a highly technical subject, one upon which the parties have expended many hundreds of pages of expert testimony in an effort to inform the court. What follows is a simplified version which will suffice for present purposes.

Both processes make use of the phenomenon of photoconductivity, the effect of light upon discharging, i. e., conducting away, an electrical charge. Reduced to its simplest terms, an "element," i. e., a metal plate or a piece of paper, is covered with a coating or layer of a photosensitive [4] material and given an electrostatic charge. Light is then shone *through* the object to be copied if that object is transparent (i. e., a transparency), or reflected *from* it if it is opaque (i. e., a sheet of paper), on to the photosensitive layer. The light strikes only those portions of the layer which correspond to the blank or white portions of the object to be copied. The dark portions of the object do not transmit or reflect the light. The light discharges the electrostatic charge from those portions of the layer which it strikes, leaving the charge undisturbed on the rest of the layer. The result is a "latent image" on the layer, consisting of electrically charged particles which correspond exactly to the dark portions of the object to be copied. If the object is a document containing printed words, for example, the latent image corresponds to those words, that is to say, it is a copy of them. This latent image is first developed by treating it with a powder, then "fixed" by the use of heat, thereby making a permanent copy of the original document.

In the Xerox process as developed at Battelle, the plate was made of metal. It was covered with a coating of selenium. Once the image was formed on this metal plate, it was necessary to transfer it to a piece of paper in order to

---

3. It was RCA's practice to make a record of the mental operations of its research staff by requiring that memoranda made by one member not only should be signed and dated by him, but should also be signed and dated by another member under the legend, "Witnessed and understood." This practice was followed, not only with respect to formal memoranda, but also, in many instances, with mere fragmentary notes.

4. The words "photosensitive" and "photoconductive" are used interchangeably in this case.

obtain the desired copy. From the beginning, Young and Greig were seeking a way to form the copy directly upon a piece of paper, thereby eliminating the transfer step. To do so would not only simplify the process, but would have certain other advantages. It would eliminate the need to clean the plate each time of one print before another print could be made. It would also avoid problems of "fatigue," i. e., wearing out of the plate.

Greig hit upon the idea of coating paper with a layer of zinc oxide enclosed or suspended in an "electrically insulating, film-forming vehicle," usually referred to as a "resin binder." He believed that the photoconductive properties of zinc oxide would cause an electrostatically charged paper coated with the zinc oxide-resin binder mixture to respond to exposure to a pattern of light in the same manner as the selenium coated metal plate used in the Xerox process.

In February 1951, Greig began experimenting with "print tests" of various zinc oxides mixed with various binders. He prepared different combinations, coated them on paper, applied the electrostatic charge and the light, developed the latent image and "fixed" it. Sometimes the result was a good clear copy of the original document; sometimes it was not. He concluded that at least some zinc oxides could be used in this fashion to make a satisfactory print directly on paper, thereby eliminating the cumbersome transfer step of the Xerox process. He determined which zinc oxides would work and which would not by the simple expedient of trying them. Those which made good prints were satisfactory. Those which did not were not.

It was Young's practice to write monthly "progress reports" of current developments in the research work of his group. These were distributed to other members of RCA's research staff. The progress report for February 1951 contains the first reference to Greig's experiments. In it Young stated that "a new photosensitive surface has been found which shows promise in electrostatic printing." He explained it briefly and concluded by saying, "Work on this new photosensitive surface will be actively continued."

Greig's researches finally led to conclusions definite enough to enable him to file with RCA's patent department on April 2, 1951 a formal "disclosure" of his invention. Under RCA's procedures, such a "disclosure" by the inventor was the first step in the long process of obtaining a patent. Upon the receipt of a disclosure, RCA's staff of patent lawyers would go to work preparing an application for a patent to be filed with the Patent Office.

In his disclosure Greig stated that the purpose of his invention was "To provide a photosensitive paper suitable for electrostatic printing * * *." He described the coating of the paper as "a suspension of pure zinc oxide powder in a solution of an insulating binder." He stated that the coating materials were readily available, relatively cheap, and nontoxic. He said that the requirements for the zinc oxide "appear to be that the material should be chemically pure, or better, in quality and a finely divided powder in form." He stated that five different zinc oxides had been shown by print tests to possess the desired photosensitive properties, whereas one zinc oxide had been found unsuitable. After pointing out the advantages of his method over the selenium coated metal plate, he concluded with the statement that his electrophotographic paper "may open up an entirely new line of attack on the continuous printing by photoelectrostatic methods."

Greig continued with his print tests on a number of zinc oxides. Two of these figure prominently in this case. One was a zinc oxide made by New Jersey Zinc Company called Florence Green Seal 8 (FGS 8) which made a good print. The other was one made by American Zinc Company called AZO 33 which gave poor results.

### The Original Application Filed on September 29, 1951

Finally the patent attorneys were ready to file the patent application. Greig signed the application as the inventor. He designated an RCA patent attorney and an RCA patent agent as his agents to prosecute the application, to amend it and to transact all business in the Patent Office connected with it. RCA's interest in the application was thus fully disclosed from the outset.

The application stated in its first sentence that the invention "relates to an improved process of forming images on a carrier base." It went on to describe the process at some length, and to point out its advantages over previous processes, by which it presumably meant Xerox, although it did not refer to that process by name.

The application stated that the "carrier base" is given "a coating of a composition comprising zinc oxide powder of relatively pure grade suspended in a vehicle composed of an electrically insulating, film-forming substance." At a later point it elaborated upon the phrase "relatively pure grade" to the extent of saying:

"It has been found, unexpectedly, that relatively pure zinc oxide, such as that designated C.P. or U.S.P. gives much better results in the present process than ordinary technical grade zinc oxide commonly used heretofore in pigments or in coated papers. Although the reason is not understood, zinc oxide having a very low concentration of impurities, when combined with the type of vehicle described herein, is capable of taking and holding an electrostatic charge in the dark and of being discharged in the presence of light."

Chemical analyses of three satisfactory zinc oxides were set forth. The application let it go at that. No test other than purity was suggested for distinguishing good zinc oxides from bad ones. The application concluded with thirty-three claims, most of which pertained to the process. A few pertained to the product, described as an "image carrier."

On March 14, 1952, the Patent Office Examiner rejected all the claims. The Office Action cited the Carlson 691 patent and rejected certain claims on the strength of that patent, together with others.

On August 29, 1952, RCA filed its response to this action. It withdrew three claims, made slight modifications in another, and argued at length that Greig's invention was not anticipated by Carlson's because (1) Carlson did not mention zinc oxide, and (2) Carlson's process required a metal backing plate and the transfer of the image formed on that plate to the ultimate paper.

On April 30, 1953, the Examiner again rejected all but three of the claims. RCA did not pursue the argument further at that time. It eventually decided to abandon the application and to file a continuation-in-part, which it did on October 1, 1953.

### The 1953 Photoconductivity Measurements

On February 4, 1953, Young made another of his longhand memoranda under the heading, "Investigations Needed." One of the items he jotted down without elaboration read "Electrostatic Orientation of ZnO in Paper Coating." This may have been the genesis of the experimentation which culminated in the photoconductivity measurements made in the summer of 1953 to which so much testimony and argument have been devoted in this case.

RCA's patent attorneys believed that it would strengthen the patent application if a criterion could be devised for distinguishing those zinc oxides which were satisfactory for use in Greig's process from those which were not. Merely specifying that the zinc oxide must be pure was not sufficiently precise. Although, as a practical matter, one could always tell a good zinc oxide from a bad one by making a print with it, as Greig had been doing for more than two

years, this trial and error method would not do for patent specification purposes. Consequently, the patent attorneys consulted another group of RCA scientists at Princeton, the Solid State Physics Section. Henry B. DeVore, a member of that section, was assigned to help.[5] He undertook to measure the photoconductivity of zinc oxides by a rather elaborate testing apparatus which was apparently his own creation.

The nature of DeVore's tests and the apparatus he used in making them, another very technical subject, is not in dispute. It may be briefly summarized in a simplified fashion as follows.

DeVore compressed dry zinc oxide into pellets. He attached two electrodes to each pellet. One electrode was connected to a source of electric power and the other to a resistor. He shone light upon the pellet. The light affected the current flowing across the pellet, which in turn affected the voltage across the resistor. DeVore measured the change in voltage. He then computed by a complicated formula the "surface photoconductivity" of the pellet, i. e., the difference between the conductivity of the surface of the pellet in the light and its conductivity in the dark.

The fact of cardinal importance here is that the light which DeVore used was "chopped," i. e., it was interrupted, not continuous or steady. He accomplished this by shining the light through a rotating slotted disc which interrupted the light 23.5 times every second. This produced alternating flashes of light and darkness upon the surface of the pellet.

In making these tests, DeVore subjected the pellets to different wavelengths of light throughout the spectrum, from 6,000 A to 3,600 A.[6] He found that their sensitivity to light was highest at a wavelength of about 3,900 A, which is ultraviolet light.

The result of the measurements was expressed in a number. This number, at first blush, is formidable, to say the least. The number most frequently mentioned in this case is "$10^{-9}$ ohm$^{-1}$/square/watt/cm$^2$." Fortunately, the most important part of this expression, for our purposes, is $10^{-9}$, which is merely an exponential way of expressing a tiny fraction which could be expressed with equal accuracy as .000000001, or 1 billionth of something. In this case, the "something" is the "ohm$^{-1}$." This is a unit of electrical conductivity.[7]

The rest of the expression quoted above, i. e., "/square/watt/cm.$^2$" refers to various other elements in the computation which remain constant throughout. Thus, "watt/cm.$^2$" refers to the intensity of the light, and "square" to the ratio between the length of the electrodes and the width of the space between them.

DeVore made up pellets of twelve different zinc oxides. He measured the surface photoconductivity of each and set forth the results in fractions of a negative ohm per square per watt per square cm. ("ohm$^{-1}$/square/watt/cm.$^2$"). The results differed with the different zinc oxides. Thus, the numerical value for one was $10^{-7}$, for another $10^{-10}$, etc.[8] At the same time, Greig made print tests with these zinc oxides. As usual, he could tell by looking at the prints which zinc oxides were satisfactory and which were not. By comparing the results of the print tests with the results of his electrical measurements, DeVore was able to establish a correlation between them. He discovered that those zinc oxides for which he had found a numerical value higher than $10^{-9}$ made good prints and

---

5. Unfortunately, DeVore died several years ago. His testimony was never taken in this case.

6. "A" stands for angstrom, a unit of length employed in measuring the wavelength of light.

7. This unit is also called a "negative ohm," or a "reciprocal ohm" or a "mho." It is the opposite of "ohm," a unit of electrical resistance.

8. $10^{-7}$ is a larger fraction than $10^{-9}$. It is therefore a higher number, as $\frac{1}{7}$th, for example, is higher than $\frac{1}{9}$th.

those for which his numerical value was lower than $10^{-9}$ made bad ones. He therefore concluded that $10^{-9}$ was the criterion which separated the good from the bad.

### The Continuation-in-Part Filed on October 1, 1953

Armed with DeVore's measurements, RCA filed its continuation-in-part application. This differed in material respects from the original application. The introductory portion stated that "the photoconductive substance should have a photoconductive surface conductivity higher than a certain minimum." A few pages later it set forth a method of making photoconductivity measurements. This passage described in substance what DeVore had done, but it did not say that the light used in the measurements was interrupted, or "chopped." The description ended with the following statement:

> "It has been found that, to be useful in the present invention, the substance selected should have a surface conductivity of at least about $10^{-9}$ ohm$^{-1}$/square/watt/cm.$^2$ when exposed to some wavelength within the range of about 3800–7000 A.

> "Having established the threshold value of photoconductivity needed in the process, it is possible to test any photoconductive substance otherwise suitable from the standpoint of stability, compatibility, dark resistivity, color, etc., in order to determine whether it can be used."

The application went on to say that a photoconductive substance found most suitable was zinc oxide, which could be either white or pink. The application stated:

> "Of the various white zinc oxides commercially available not all have a surface photoconductivity greater than about $10^{-9}$/ohm$^{-1}$/square/watt/cm.$^2$ at a wavelength of about 3900 A which is about the wavelength of peak photosensitivity for this material, but many pure grades of ZnO made by a dry process have been found suitable."

The application set forth twenty-seven claims, of which fifteen were process claims, nine were product claims relating to the recording element, and three related to apparatus for electrostatic printing. The nine claims relating to the recording element specifically referred to the "about $10^{-9}$" criterion. The others did not.

This application fared no better than its predecessor. On March 29, 1954, the Examiner rejected all the claims. This produced an amendment filed by RCA on September 7, 1954, which cancelled three claims, amended seven others, and argued the merits of the claims at some length. A further amendment followed on August 8, 1955. This added four claims, three of which contained the "about $10^{-9}$" language.

The Patent Office was adamant. On December 2, 1955, the Examiner rejected all claims. The Examiner added additional reasons for his rejection by a supplemental letter on March 7, 1956.

RCA's response to this action was an amendment filed on September 4, 1956, supported by various affidavits. These constitute the principal basis of SCM's charge of fraud. Before discussing the amendment and the affidavits, we must first consider certain activities of the RCA research staff which preceded the filing of this amendment.

### RCA's Measurements and Tests in 1955 and 1956

In May 1955 DeVore had occasion to reconsider his 1953 photoconductivity measurements. In that month he measured, apparently on the same apparatus which he had used in 1953, using chopped light, pellets made of two new zinc oxides which he had not measured in 1953, New Jersey Zinc Company's C.E. 8099–5–3 and C.E. 8099–3. He also measured new pellets of FGS 8, other pellets of which he had measured in 1953. By this time this zinc oxide, because of its particularly favorable photoconductive properties, had been adopted by RCA as its standard zinc oxide for use in its work on Electrofax coatings.

DeVore found that his results on FGS 8 in May 1955 differed from the results which he had obtained on that zinc oxide in 1953. This led him to observe in his notebook under date of May 25, 1955:

"All curves of surface conductivity in N.B. P–3129 [DeVore's 1953 notebook] should be raised one order of magnitude."[9]

Translated into layman's language, DeVore was saying in this entry that his 1953 photoconductivity values were wrong and that they should have been approximately ten times higher. He based this conclusion upon the fact that his measurement of FGS 8 in 1955 yielded a photoconductivity value of 3.45 x $10^{-7}$, whereas in 1953 he had found it to be 3.5 x $10^{-8}$, a difference of almost exactly ten times.[10]

In another notebook entry made on the same day, May 25, 1955, DeVore said, apropos of the measurements which he had just completed:

"[T]he peak surface photoconductivity turned out to be just about 1 order of magnitude higher than the value computed two years ago. The improved energy measurement accounts for most of the difference, and sample to sample variations take care of the rest."

The reference to "improved energy measurement" relates to the calibration of the equipment, which DeVore concluded had not been precisely accurate in 1953. The phrase "sample to sample variations," apparently refers to the fact that both in 1953 and 1955 DeVore measured several samples or pellets of each zinc oxide. The results were not exactly the same for each sample.

Although the reference to "sample to sample variations" may be thought to qualify to some extent the flat statement that the 1953 measurements should be raised by one order of magnitude, nevertheless the net result of the two entries, made on the same day, leaves no room for doubt that in 1955 DeVore believed that his measurements in 1953 had been ten times too low. He accounted for the error on the theory that his equipment had not been properly adjusted in 1953.

DeVore's notebook indicates that he discussed his 1955 results with Greig and also with E. C. Giaimo, another member of Young's group. Nevertheless, RCA seems to have done nothing about them at the moment. In the summer of 1956, however, which was after the patent application had been again rejected by the Patent Office, a flurry of activity took place.

James A. Amick, a Ph.D. in physical chemistry, was employed in RCA's Materials Research Laboratory. RCA assigned him, Giaimo, and a third scientist, Spicer, to review DeVore's work and to make additional photoconductivity measurements of their own.

On June 14, 1956, Young wrote a memorandum of his conference with Amick, Giaimo and Hill. The latter was an RCA patent agent who up to that date had handled the patent application. The memorandum stated:

"To strengthen our position on the basic Electrofax paper application the tests of photoconductivity made originally by DeVore have to be repeated, the measurement procedure established and absolute numbers obtained. Hill will then prepare a revised application."

Amick first checked DeVore's equipment as it had been recalibrated by DeVore in 1955. He found it to be now correctly adjusted. On June 6, 1956, Amick checked DeVore's calculations upon the basis of DeVore's data. He found that DeVore's computations were correct. It

---

9. An order of magnitude is ten times, *i. e.*, $10^{-8}$ is 10 times $10^{-9}$, or one order of magnitude higher than $10^{-9}$. Two orders of magnitude are 100 times, not 20.

10. 3.5 x $10^{-8}$ is a value approximately one-third of the way between $10^{-8}$ and $10^{-7}$.

5 x $10^{-8}$ would be halfway between. 10 x $10^{-8}$ is just another way of expressing $10^{-7}$, since $10^{-7}$ is ten times higher than $10^{-8}$. These prefixes permit a more exact use of the exponential system of expressing numbers.

followed that the error in the measurements in 1953, if there was one, must have been due to faulty data rather than to incorrect arithmetic.

Shortly thereafter, Amick, Spicer and Giaimo made new photoconductivity measurements on two zinc oxides, the familiar FGS 8 and AZO 33. They used DeVore's equipment and employed chopped light. The photoconductivity value which they obtained for FGS 8 was $9 \times 10^{-7}$. The value for AZO 33 was $5.8 \times 10^{-9}$. These results corresponded roughly with DeVore's 1955 results on FGS 8, although the result obtained by Amick's group on this zinc oxide was even higher than DeVore's result in 1955. This confirmed DeVore's opinion that his 1953 measurements were at least ten times too low.

Giaimo also employed a different set of apparatus to make measurements on FGS 8 and AZO 33 by the use of light that was continuous, i. e., steady, rather than chopped. This produced photoconductivity values for FGS 8 and AZO 33 approximately 100 times higher than the values obtained by chopped light in 1956.

Young noted these developments in his progress reports for June and July 1956. The June report revealed that the 1956 measurements by chopped light yielded higher values than DeVore had obtained by that method in 1953. Young suggested as a possible explanation that "photoconductors made under identical conditions are known to vary by an order of magnitude or so from batch to batch." The July report noted that the use of steady light yielded results 100 times higher than those obtained by chopped light in 1956.

At this point an RCA patent attorney named Greenspan succeeded Hill as the lawyer in charge of the patent application. Greenspan prepared four affidavits, two of which were signed by

Amick, one by Greig and one by DeVore. He filed these in the Patent Office in support of an amended application filed on September 4, 1956.[11] The DeVore affidavit is the most important for our purposes. In it DeVore described the apparatus and methods he had employed in making his photoconductivity measurements. He clearly stated that he had used chopped light. He then set forth in tabular form the "values of maximum surface photoconductivity" which he had obtained for each zinc oxide. He did not say when he had obtained them.

The table listed fourteen zinc oxides. Twelve of them, including FGS 8, were the ones which DeVore had measured in 1953. The other two were the ones which DeVore had measured for the first time in 1955, New Jersey Zinc C.E. 8099–5–3 and C.E. 8099–3.

The affidavit did not state that DeVore had measured FGS 8 again in 1955. It did not include the photoconductivity value for FGS 8 which DeVore had obtained in 1955. The values set forth in the table for all the zinc oxides, except the two New Jersey Zinc Company ones which DeVore had first measured in 1955, were the values which DeVore had obtained in 1953. They were not corrected by increasing them by one order of magnitude.

Greig's affidavit described his method of making print tests. He attached copies of prints which he had made with a number of zinc oxides, including the fourteen which DeVore had measured.

Amick's principal affidavit, as far as pertinent for present purposes, recapitulated the data in DeVore's affidavit and in Greig's.[12] It set forth in parallel columns for each of the fourteen zinc oxides the photoconductivity value reported in DeVore's affidavit and the result of the print test stated in Greig's affidavit. It then concluded that those zinc oxides which DeVore had found to

11. A fifth affidavit describing a survey made by Arthur D. Little Company was filed in December 1956. This is unimportant for our purposes.

12. Amick's other affidavit related to tests which he had made of photoconductive substances other than zinc oxide.

possess a photoconductivity value of greater than $10^{-9}$ made good prints, and conversely, those with a photoconductivity value of less than $10^{-9}$ made poor prints.

Three observations may be made about this affidavit.

1. The data contained in the DeVore affidavit would better have supported a conclusion that the dividing line between good and bad zinc oxides was $10^{-8}$ rather than $10^{-9}$. As far as the zinc oxides which produced good prints were concerned, $10^{-8}$ and $10^{-9}$ were equally correct criteria, for all the zinc oxides which produced good prints had a photoconductivity value, according to DeVore, of higher than $10^{-8}$, and therefore necessarily higher than $10^{-9}$. The converse, however, was not entirely true. There was one zinc oxide, New Jersey Special No. 3, which produced a poor print but was found by DeVore to have a photoconductivity value higher than $10^{-9}$, but lower than $10^{-8}$. Hence the fact that this zinc oxide gave an unsatisfactory print would be consistent with a $10^{-8}$ criterion but not with a $10^{-9}$.

2. The photoconductivity value given for AZO 33 was that which DeVore had found in 1953, $1.5 \times 10^{-11}$. This was consistent with the results of Greig's print test, which showed that the print on this zinc oxide was poor. In 1956, however, Amick had found a photoconductivity value for this zinc oxide of $5.8 \times 10^{-9}$ which is higher than $10^{-9}$. Judged by the $10^{-9}$ standard, therefore, AZO 33 should have made a good print. The affidavit did not include Amick's 1956 photoconductivity finding on this zinc oxide. $5.8 \times 10^{-9}$ is lower than $10^{-8}$. Again, this indicates that $10^{-8}$ was a better criterion.

3. Finally, it should be noted that in 1961 Amick wrote a chapter for a book eventually published in 1965. The chapter was entitled "A Review of Electrofax Behavior." In it he set forth precisely the same data as was contained in DeVore's and Greig's affidavits in 1956. This time Amick drew the conclusion that:

"Oxides whose maximum surface conductivity lies above about $10^{-8}$ ohms$^{-1}$/square/watt/cm$^2$ are satisfactory for Electrofax use."

Amick was in charge of assembling the data to support the amended application. Greenspan was the one who wrote it up in the affidavits. Greenspan testified that Amick told him that "they had repeated these tests and some others and had gotten data that was somewhat different * * *." He testified that Amick asked, "Does this spoil our patent claims?" or words to that effect, to which Greenspan replied, "Don't worry about that * * * I would take care of that. And you, Dr. Amick, take care of the technical side of it."

Greenspan further testified that he "did not want to see the details of it," that he asked Amick to "evaluate the data" and to give him "representative values." He said that this is what Amick did and that this is what he, Greenspan, presented to the Patent Office.

Amick testified that he made the decision as to what photoconductivity measurements were to be reported to the Patent Office in these affidavits. More specifically, it was he who decided to report DeVore's uncorrected 1953 results rather than DeVore's 1955 results on FGS 8 or Amick and Giaimo's 1956 results. He testified in substance that after discussing the situation with DeVore, he concluded that measurement within an order of magnitude was "the precision we could expect."

### RCA's Subsequent Dealings with the Patent Office

On the strength of these affidavits, Greenspan argued in support of RCA's amended application that the $10^{-9}$ criterion which RCA had previously put forth in its continuation-in-part application filed on October 1, 1953, was a valid dividing line for distinguishing satisfactory zinc oxides from unsatisfactory ones. He referred to it as "ap-

plicant's [*i. e.*, Greig's] discovery" and pointed out that no such criterion was revealed in the prior art.

The result of all this argument and affidavit-drawing might well have been discouraging. On July 25, 1957, the Examiner again rejected all the claims. RCA, however, was undaunted. On January 22, 1958, it filed a further response to the Patent Office Action. It withdrew a few claims but urged reconsideration of the others. This perseverance was at last rewarded, at least partially. On July 17, 1958, the Examiner allowed the process claims but finally rejected the product claims. Additional argument on the part of RCA as to the latter was unavailing.

In January 1959, RCA appealed to the Board of Appeals of the Patent Office. In its brief on appeal, RCA argued the importance of the $10^{-9}$ criterion. On September 30, 1960, the Board of Appeals affirmed the Examiner's decision.

In October 1960, RCA began an action against the Commissioner of Patents in the United States District Court for the District of Columbia, seeking a judgment compelling the Patent Office to grant a patent on the product claims. At the conclusion of the trial of this action on January 25, 1962, the District Court ruled that RCA had not shown that the Patent Office was in error in rejecting the claims. The court recommended, however, that RCA endeavor to amend the claims in an effort to overcome the Patent Office's objection.

In accordance with the court's suggestion, RCA cancelled certain of the claims in issue and amended the others. The amendment did not change the $10^{-9}$ language. The Patent Office accepted the amendment and at long last the patent issued on September 4, 1962.

Of the twenty-two claims in the patent as finally issued, all but one, the first, included the phrase "surface photoconductivity higher than $10^{-9}$, etc." [13] The specification referred to this criterion and described the test by which the photoconductivity of a particular zinc oxide could be determined. The test so described was essentially DeVore's procedure, with the notable exception that the patent did not mention that the measurements were to be made with the use of chopped light.

### The Alleged Fraud on the Patent Office

The most grave charge of fraud on the part of RCA in dealing with the Patent Office is based upon the affidavits which RCA filed with the Patent Office in September 1956 and the argument made by RCA to the Examiner on the strength of those affidavits. As we have seen, in the continuation-in-part application filed in October 1953, RCA had taken the position, as a result of DeVore's 1953 measurements, that zinc oxides having a photoconductivity value of at least "about $10^{-9}$ ohms$^{-1}$/square/watt/cm.$^2$" were satisfactory for use in Greig's process and that those with a lower photoconductivity value were not. The affidavits filed in September 1956 were intended to support that position. Amick's affidavit stated that conclusion.

The affidavits omitted data which bore upon the validity of this conclusion. They omitted the results of DeVore's 1955 measurement of FGS 8 and of the measurements made by Amick, Giaimo and Spicer in 1956 of FGS 8 and AZO 33, all of which tended to contradict DeVore's 1953 findings. They omitted all reference to DeVore's opinion, expressed in his notebook in 1955, that his 1953 results should be corrected by raising them by one order of magnitude. The affidavits set forth DeVore's 1953 results without any such correction.

There is some evidence to the effect that photoconductivity measurements made by chopped light can be expected to vary by approximately one order of

13. In some claims the phrase "higher than $10^{-9}$" was qualified by the word "about," so that it read, "higher than about $10^{-9}$." No reason is apparent for inserting the word "about" in some claims and not in the others. It may have been due to careless draftsmanship.

magnitude from one batch to another of the same zinc oxide, even though each batch is measured in exactly the same way. Young expressed that opinion in his June 1956 progress report. His opinion has found some unexpected corroboration years later in comments made in the initial report of the expert who testified for SCM at the trial.

This variation is apparently what Amick had in mind when he testified that a measurement within one order of magnitude was "the precision we could expect." It is tolerably clear that Amick justified the omission of the data which pointed to $10^{-8}$ as the proper criterion by persuading himself that, inasmuch as $10^{-8}$ was only one order of magnitude higher than $10^{-9}$, it was accurate enough to continue to put forward $10^{-9}$ as the correct dividing line.

I am not convinced by this argument that the failure to reveal the results of the more recent chopped light measurements was proper. In the first place, if such a variation in results is to be expected, that fact in itself was important and should have been revealed. There was no hint of it in the affidavits or in Greenspan's arguments to the Examiner.

In the second place, the fact that some variation may exist about a given norm does not change the norm. The evidence establishes that the correct norm was at least $10^{-8}$ rather than $10^{-9}$. Amick himself expressed that opinion in his 1965 book, even on the basis of DeVore's uncorrected 1953 data. If some variation is to be expected, and if DeVore's 1953 data is increased by approximately one order of magnitude, as DeVore recommended, then the correct result could be nearer $10^{-7}$ than $10^{-8}$, about 100 times higher than $10^{-9}$. On the basis of the evidence I find that it was inaccurate to report $10^{-9}$, without change or qualification, as the correct standard.[14]

Did RCA, that is to say, the RCA scientists and lawyers who had a hand in this affair and whose knowledge binds RCA, know that it was inaccurate? I cannot escape the conclusion that they did. Amick knew all the facts. Young, as the head of the project, must have known them. In all likelihood Greenspan knew them as well. In any event, he should have known them. It was his duty to inform himself about them. He could not avoid responsibility by trying not to "see the details." *Charles Pfizer & Co. v. Federal Trade Commission*, 401 F.2d 574 (6th Cir. 1968), cert. denied, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969).

I appreciate that there are times when the conclusions to be drawn from scientific experiments come down to a matter of professional judgment or scientific debate. See *Armour & Co. v. Wilson & Co.*, 274 F.2d 143 (7th Cir. 1960); *Ritter v. Rohm & Haas Company*, 271 F. Supp. 313, 343 (S.D.N.Y.1967). In my opinion this is not such a case. I find that RCA knew that the unqualified assertion of $10^{-9}$ as the correct standard was inaccurate. I find that RCA continued to assert that standard to the Patent Office because RCA feared that otherwise its chance of obtaining a patent would be impaired. In somewhat incoherent testimony Greenspan as much as admitted that he was afraid that any changes in the results of the 1953 measurements or any concession that variations in result from batch to batch could be expected to occur would cast doubt upon the contention made by RCA to the Patent Office that it had discovered a practicable scientific method for separating satisfactory zinc oxides from unsatisfactory ones. Greenspan testified:

"The problem I had was that we had gone into the Patent Office and we said there are two classes of zinc

14. It is not a sufficient answer to say that in 1953 RCA had qualified the $10^{-9}$ by referring to it as "about" $10^{-9}$. In the first place, as we have seen, RCA was not consistent in the later years of the patent prosecution in insisting on the "about."

Approximately half of the claims in the patent as finally issued do not contain it. In the second place, even if this word had consistently remained part of the formula, the phrase should have been "about $10^{-8}$," not "about $10^{-9}$."

oxide that are separated by the value of surface photoconductivity. * * * So, if the test itself was not reproducible, or if it didn't really divide zinc oxides into two parts, then right at the outset it wasn't a worthwhile thing to go after.

\* \* \* \* \* \*

"Now, I knew of the criterion. It was my problem to present to the Patent Office reasons why I thought this limitation in the claim distinguished the claim over the prior art and whether he spoiled it as related to that problem that I had: that is, would it make it more difficult for me to argue patentability with this limitation."

It may be unduly harsh to characterize RCA's conduct here as fraud. Conduct which has been so labeled in the decisions has, by and large, been more reprehensible than this. But at the least, it was conduct which was lacking in candor. It was intentional nondisclosure of relevant data which might have affected the outcome of the patent application.

■ It has been held in several cases that the party asserting invalidity of a patent on the ground of fraud has the burden of proving, not only the fraud, but also the fact that the fraud was material, *i. e.*, that if the Examiner had known the true facts, he would not have authorized the issuance of the patent. Charles Pfizer & Co. v. Federal Trade Commission, *supra;* Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461 (D.Del.1966), rev'd on other grounds, 374 F.2d 473 (3d Cir. 1967), cert. denied, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967); Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F.Supp. 1 (E.D. Pa.1958), aff'd, 268 F.2d 395 (3d Cir. 1959), cert. denied, 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959).

In at least one Supreme Court decision, misleading affidavits submitted by the applicant which "were not the basis for it [the granting of the patent] or essentially material to its issue" were held insufficient to overcome the presumption of validity which attaches to a patent. Corona Cord Tire Company v. Dovan Chemical Corp., 276 U.S. 358, 374, 48 S.Ct. 380, 384, 72 L.Ed. 610 (1928).

■ The issue of materiality is an issue of ultimate fact to be determined by the court, as any other fact, on the basis of all the evidence. Although there is language in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 247, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), which is susceptible of the construction that materiality is to be presumed, I cannot reconcile this language, if taken literally, with the other decisions. The facts in *Hazel-Atlas* were unusual and somewhat extreme. I do not regard the Court's statement that the patentee was "in no position now to dispute" the effectiveness of the misrepresentation as establishing a rule for all cases.

Proving materiality is by no means an easy task. In *Charles Pfizer & Co.* it was established by calling the Examiner himself who testified that he would not have granted the patent had he known the facts which defendants failed to disclose to him. But this is an unusual procedure, and one which is not normally possible in view of the policy of the Patent Office against permitting its Examiners to testify in private litigation. In the absence of such direct testimony, the court must fall back upon the Patent Office record, the "file wrapper" of the patent, for such light as it may cast upon the problem.

In this instance, as is frequently the case, the light that the file wrapper casts is dim. After a painstaking study of the difficult language of the Examiner's "actions," I have found no convincing evidence, one way or the other, as to what the Examiner would have done had he been informed in September 1956 that photoconductivity measurements by the DeVore method were somewhat inexact and that in any event, $10^{-8}$ was a more accurate minimum measurement for good zinc oxides than $10^{-9}$. Conceivably, he would have discarded the DeVore procedure as worth-

less and would have denied the patent on the ground that RCA had failed to provide a reliable scientific method for distinguishing good zinc oxides from bad. On the other hand, for all that appears, he might have concluded that a specification of at least $10^{-8}$, even allowing for some variation, was sufficiently definite. In the final analysis, what position the Examiner would have taken had RCA been candid with him remains a matter of speculation.

■ Under these circumstances, I am compelled to conclude that SCM has failed to carry the burden of proving that RCA's nondisclosure was material in a "but for" sense, i. e., that the patent would not have issued if RCA had revealed all the relevant information. I must conclude therefore that SCM has not proved that RCA procured the patent by fraud and has not shown the patent to be invalid on that ground.

This conclusion, however, does not dispose of the matter. We still have to deal with the doctrine of "unclean hands." The line between fraud which will invalidate a patent and "unclean hands" which will bar its enforcement is a shadowy one. The decisions generally are not clear on it. Some courts phrase the results in terms of invalidity, others speak of unenforceability. This is a case in which the problem must be faced.

■ There is broad language in several decisions to the effect that a patent is affected with a public interest, that complete candor and full disclosure is required of a patent applicant in his dealings with the Patent Office, and that any inequitable conduct on the part of the applicant in obtaining a patent will be sufficient to dissuade a court of equity from rendering him its aid in enforcing the patent against infringers. Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Kingsland v. Dorsey, 338 U.S. 318, 70 S.Ct. 123, 94 L.Ed. 123 (1949); Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65

S.Ct. 993, 89 L.Ed. 1381 (1945); Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir. 1970).

These decisions do not appear to require a finding that the inequitable conduct had a "but for" effect on the granting of the patent as a prerequisite to a court's refusal to enforce it.

Judge Wright was concerned with this problem in Corning Glass Works v. Anchor Hocking Glass Corp., *supra*. Having found that the party challenging the patent had failed to establish its invalidity on the ground of fraud because he had failed to prove that the patent would not have issued if the true facts had been revealed, he went on to say:

"Even though misrepresentations made to the Patent Office are not legally material to the issuance of a patent, nevertheless, this Court, being a court of equity, can and should refuse to enforce the patent if the Court finds the patentee made intentional misrepresentations to the patent examiner, i. e., if the patentee came into the court with unclean hands. The proceeding before the patent examiner is ex parte and an examiner has no way, in many cases, to ascertain the truthfulness of the representations made to him. Necessarily he must rely on the good faith of the applicant. Absolute honesty and good faith disclosure is necessary." 253 F.Supp. at 470.

■ I agree with this statement. It fits the present case. No one can tell with certainty what would have happened if RCA had dealt fairly with the Patent Office. But the fact remains that RCA did withhold relevant facts. Which side in this litigation is to suffer from this conduct? It is appropriate that it should be RCA who suffers. Any other rule would fail adequately to discourage conduct of this sort merely because of the circumstance, which must be present in many cases, that it turns out to be impracticable to ascertain what

the Examiner, who did not know the true facts, would have done if he had known them. The evidence here justifies the conclusion that this court should not enforce a patent obtained under these circumstances. I so hold.

### SCM's Other Charges of Fraud

In view of the conclusion I have reached on the 1956 affidavits, it is unnecessary to dwell upon SCM's other accusations. Mention may be made of the only one which involved any misstatement of fact. This consisted of a series of references in Greenspan's written arguments to the Patent Office, one made in September 1956 and another in January 1959, to "the applicant," Greig, as the discoverer of the photoconductivity measurement technique. Of course, Greig did not devise this test, and hence, speaking literally, these statements were not true. But they could hardly have been intended to be taken literally, and in any event, they could not have misled the Examiner.

In the first place the Examiner, accustomed to dealing with RCA and other large corporations, must have understood that RCA operated in the production of patents on what might be called an assembly-line basis. One man had an idea, another man tested it, others were called upon to make still more tests or measurements, and a patent lawyer, himself a full-time RCA employee, wrote up the application and the affidavits and handled all the dealings with the Patent Office. At the very outset of a patent prosecution, the inventor assigned all his rights to RCA and designated an RCA attorney as his agent to represent him in prosecuting the application. This was not a case of a lone inventor struggling to do by himself all the inventing and all the testing and all the paper work. It was a large-scale cooperative enterprise.

In the second place, it was abundantly clear from the affidavits that it was DeVore, not Greig, who had made the photoconductivity measurements. Although Greenspan's choice of words may have been unfortunate, there is no sound basis here for invalidating the patent or holding it unenforceable.

The same can be said of the other statements or omissions of which SCM complains. I have considered each but believe it unnecessary to discuss any of them in detail. They are at most highly debatable. They are not sufficiently convincing evidence of misrepresentation or nondisclosure. The conclusion which I have reached as to the unenforceability of this patent is based solely upon the nondisclosure of the photoconductivity results in 1955 and 1956.

### Section 112

Each of the twenty-two claims in the 539 patent, except the first, is limited to a process or a product which employs a zinc oxide "having a surface photoconductivity higher than $10^{-9}$ ohms$^{-1}$/square/watt/cm.$^2$ at about 3900 A." [15] The specification states:

"In order to determine whether or not a particular zinc oxide is suitable for use in the present invention, a test of its photoconductive properties may be made as follows."

The specification then proceeds to describe DeVore's technique in measuring the photoconductivity of zinc oxide pellets, but it does not specify whether the light to which the pellets are subjected is steady or chopped. Since it does not even mention the chopping, obviously it says nothing about a chopping rate.

The description concludes with the following passage:

"It has been found that, to be useful in the present invention, the zinc oxide selected should have a surface photoconductivity of at least about $10^{-9}$ ohm$^{-1}$/square/watt/cm.$^2$ when exposed to a wavelength of about 3900 A.

---

15. As previously pointed out, in some of the claims the word "about" is inserted before "$10^{-9}$."

"Having established the threshold value of a surface photoconductivity needed in the process, it is possible to test any zinc oxide otherwise suitable from the standpoint of stability, compatibility, dark resistivity, color, etc., in order to determine whether it can be used."

It is apparent that RCA's purpose in so limiting the patent claims and in describing the test by which that limitation can be applied, was to differentiate this invention from prior art patents, notably Patent No. 2,287,348 to Hayden, which spoke in general terms of coating paper with zinc oxide. RCA recognized that it was necessary to make clear that it did not claim all zinc oxides. It claimed only those which possessed a specific minimum photoconductivity as determined by a specific test.

35 U.S.C. § 112 requires that the specification shall contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains * * * to make and use the same * * *."

The section also requires that:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

■ The question is whether the 539 patent complies with these requirements. SCM contends that it does not because (1) the $10^{-9}$ criterion is incorrect, and (2) the description of the measuring procedure is unworkable because it does not specify the type of light to be used. I conclude that these contentions must be sustained.

I have already held that the $10^{-9}$ number is incorrect and that it should be at least $10^{-8}$, with the additional qualification that some variation is to be expected in testing different batches of the same zinc oxide. As they now stand, the claims are too broad. They include zinc oxides which in fact are not satisfactory

for the purposes of the patent. It follows that the claims do not distinctly claim the subject matter of the invention.

The failure of the specification to identify the type of light to be used is another fatal defect. The evidence is clear that the results obtained with steady light are startlingly different from those obtained with chopped light. Moreover, even as to chopped light, there is evidence to show that the results vary according to the rate of the chopping. It is clear, therefore, that, to be of any value to one desiring to make the test, the description should have specified, not only that the light should be chopped, but also how frequently it should be chopped, *i.e.*, the number of flashes of light per second.

No reason is apparent for the omission of this vital information from the patent specification. DeVore's affidavit clearly stated that he had used light chopped 23.5 times per second. The Patent Office was thus fully advised on this point and no question of fraud or nondisclosure can arise here. I can only surmise that the failure to include this data in the patent specification was due to inadvertence. This explanation is made more probable by the fact that in another Greig patent, No. 3,060,020 issued on October 23, 1962, entitled "Method of Electrophotographically Producing a Multicolor Image," DeVore's measuring procedure is again described, but this time the description is explicit in stating that:

"The light beam projected onto the surface is chopped at about 23.5 c.p.s. by a constant speed rotating disc, pierced to produce equal intervals of light and darkness."

■ Unfortunately for RCA, the inclusion of this information in the affidavit does not save the patent. It must appear in the patent itself. Kaiser Industries Corp. v. McLouth Steel Corp., 400 F.2d 36 (6th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed. 2d 124 (1969). For the same reason it

would seem to make no difference that descriptions of DeVore's procedure which appeared from time to time in various learned publications mentioned the fact that chopped light was employed.

There is a conflict in the opinions of the respective experts as to whether a person familiar with these matters in reading the patent would necessarily understand that the use of steady light could not have been intended. I am not persuaded that he would.[16] In any case, there is no way in which such a knowledgeable reader could have divined the chopping rate, even if he did believe that chopped, rather than steady, light was to be used.

Curiously enough, it seems to be the fact that in actual practice, no one pays any attention to this elaborate measuring technique. Certainly Greig never did. He determined which zinc oxides would work and which would not by trying them out, i.e., by making prints with them. Apparently RCA's licensees do the same, or perhaps by this time the suitable zinc oxides are so well known that there is no need to measure their photoconductivity. SCM alone seems to have concerned itself with DeVore's procedure, as will appear in the subsequent discussion of SCM's second count. This fact makes this whole discussion seem theoretical and unreal.

 Section 112, however, makes no allowance for such a situation. It requires a patentee to describe his invention in "full, clear, concise, and exact terms," in his patent specification and to distinctly claim the subject matter in his patent claims, whether anyone bothers to read them or not. Only by so doing can he secure his monopoly. The court has no discretion. It must enforce the statute. Since it is clear that the specification and the claims do not fulfill the requirement of Section 112, claims 2 to 22, inclusive, are invalid.

 As to claim 1, the situation is somewhat different. That claim does not refer to the $10^{-9}$ criterion. SCM attacks it nevertheless for overclaiming, in violation of Section 112. I conclude that this contention must be sustained.

Claim 1 pertains to a "process of forming a visible image." It states that one of the steps of that process is "providing a recording element comprising a composition comprising a photoconductive zinc oxide suspended in an electrically insulating, film-forming vehicle for said zinc oxide."

 All zinc oxides are photoconductive to a greater or lesser extent. Claim 1 includes all of them, despite the fact that, as the specification emphasizes, not all zinc oxides are useful in this process. Claim 1 is therefore invalid. Corona Cord Tire Company v. Dovan Chemical Corp., supra; Teleflex Incorporated v. American Chain & Cable Co., 273 F.Supp. 573 (S.D.N.Y.1967). The claim appears to have been intentionally drafted in order to obtain a monopoly broader than is justified. Under such circumstances, the claim cannot be upheld by reading it in the light of the specification. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2d Cir. 1958), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed. 2d 112 (1958).

### Section 102

 This section presents no difficulty. Section 102 prevents patentability only where the invention was "identically disclosed" by the prior art. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263 (2d Cir.1967). That is not the case here. SCM does not seriously contend otherwise.

### Section 103

There is a serious problem here, as there is in many patent cases. The question is whether, even though Greig's invention had not previously been identically disclosed, "the differences between the subject matter sought to be

16. There is some evidence, not very explicit, to indicate that even Giaimo thought that the patent called for steady light.

patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The essential facts as to the prior art are as follows.

SCM relies upon eight patents, five of which are cited as references in the 539 patent, and upon thirteen publications, plus the Battelle reports, as evidence of the prior art. One of the eight patents, No. 3,121,006 to Middleton and Reynolds was not issued until February 11, 1964, some seventeen months after the 539 patent. It was issued on an application filed on June 26, 1957, almost six years after the filing date of Greig's original application. SCM contends that nevertheless this patent counts as part of the prior art as defined in Section 102(e), because the patent is entitled to the benefit of the filing date of an earlier patent, No. 2,663,636 to Middleton. That date, May 25, 1949, was earlier than Greig's. To establish this contention SCM relies entirely upon a decision of the Court of Customs and Patent Appeals, Application of Middleton, 319 F.2d 552, 50 C.C.P.A. 1479 (1963). That decision does not so hold. There being no other evidence on the point, I shall not consider this patent as part of the prior art for the purposes of this case.

Of the remaining seven patents, the two most important are No. 2,297,691, issued to Carlson on October 6, 1942, and No. 2,663,636, issued to Middleton on December 22, 1953. Each was considered by the Examiner. As already noted, the Carlson patent was the basic patent on Xerography. Another patent to Carlson, No. 2,551,582, issued on May 8, 1951, which pertains to that subject, is among the eight cited by SCM. No evidence, however, was offered as to this patent and it seems to add nothing to the case.

A description, in somewhat simplified form, of the Xerographic process revealed in the Carlson 691 patent is set forth earlier in this opinion and need not be repeated here. It was this process which was studied and developed from June 1948 to June 1950 at Battelle. Middleton was a physicist employed at Battelle from 1945 to 1953.[17] He participated in the research which went on there on Xerography and in the course of that work he devised the invention which ultimately was embodied in his 636 patent.

The fundamental idea of forming a latent image on an electrostatically charged photosensitive layer was disclosed by Carlson's patent. It is employed in Greig's patent as well. But Carlson's Xerox process, as developed at Battelle, employed a photosensitive layer of selenium coated on a metal plate. Greig's process employs zinc oxide enclosed in a resin binder coated upon a sheet of paper. What we are trying to determine is whether Greig's process, manifestly different, was obvious.

It is true that Carlson's specification states that while he has described his photoconductive layer as attached to a metal backing, it may be applied to paper, provided that there is a "conductive backing by contact during the exposure step to drain off the charge." Carlson's specification also says that "[o]ther photoconductive materials having insulating characteristics in the dark may also be used." He suggests certain others, not including zinc oxide. He recommends against "semi-conductors," however:

> "The semi-conductors, while of better conductivity in the light than in the dark, will not hold an electrostatic charge on their surface even in the dark."

RCA argues that Carlson's paper with a "conductive backing" is not the paper used in Greig's process. This appears to be correct. In any event, it is clear not only that Carlson was concerned primarily with metal plates, not with paper, but that as far as the paper is

---

17. He was also an expert witness for SCM at this trial.

concerned, Carlson did not suggest coating it with zinc oxide enclosed in a resin binder. Indeed, if zinc oxide is a "semi-conductor," Carlson actually discouraged any use of zinc oxide, although he never mentioned it by name.

An insulator is a material with high electrical resistance and correspondingly low conductivity. A conductor is just the opposite. A "semi-conductor" is in between. The evidence shows that materials having a resistance of from $10^8$ to $10^{10}$ ohm/cm. are generally regarded as semi-conductors. There is evidence to show that before Greig began his experiments in February 1951, the resistance of zinc oxide was known to be of an order which makes it a semi-conductor.

In order to be useful in electrophotography, the material in the layer must possess two qualities which at first blush seem antithetic, (1) a high resistivity in the dark, so as to be able to retain an electrostatic charge on the portion of the layer which is not exposed to light, and (2) a high conductivity in the light, so that the charge will be rapidly dissipated from those parts of the layer which are exposed to light. In the passage quoted above, Carlson was saying that semi-conductors, while reasonably conductive in the light, are unsatisfactory for electrophotography because they are not sufficiently resistant in the dark.

This conclusion, specifically with respect to zinc oxide, was borne out by the extensive research on photoconductive properties of materials carried on at Battelle from 1948 to 1950. A Battelle report dated March 24, 1949, which Greig presumably read in the course of keeping up with the work at Battelle, expressly stated that "[t]he following materials would not hold an electrical charge under the experimental conditions and hence could not be tested for photoconductivity." Among the materials listed was zinc oxide.

Another researcher, Wainer, doing work for the Signal Corps on electrophotography, reached the same conclusion. In September 1951, he reported that zinc oxide, among other materials, was "ineffective on the basis that the dark resistance was too low to enable these materials to hold a charge."

There are two Battelle reports in June 1950 which express the conclusion that to be useful in electrophotography, a material must have a resistance in the dark of approximately $10^{15}$ ohms/cm. One of these reports says that this means that the material must be in the class of "good insulators."

Although some of the learned articles published before February 1951 state that zinc oxide is a good insulator, none of them, with one exception, ascribes to it a resistance in the dark approaching $10^{15}$ ohms/cm. The exception is an article entitled "Red Zinc Oxide," published by Ehret & Greenstone in 1943. Unfortunately, there is a problem about this article. What it actually says is that the authors had tested white zinc oxide and had found it to have a conductance (not a resistance) of $10^{14}$ mhos/cm. Since such a high conductance would be phenomenal, SCM argues that the $10^{14}$ is a typographical error and that it should have read $10^{-14}$. A conductance of $10^{-14}$ would mean a resistance of $10^{14}$, because resistance is the inverse or reciprocal of conductance.

There is authority for the proposition that prior art publications must be taken for what the author said, not for what one may think he meant to say. Badische Anilin & Soda Fabrik v. Kalle & Co., 104 F. 802 (2d Cir. 1900); Lever Bros. Co. v. Procter & Gamble Manufacturing Co., 139 F.2d 633 (4th Cir. 1943). These decisions, however, were concerned with Section 102. The invention in question is not "identically disclosed" in a prior publication if that prior publication does not in fact disclose it, even though one may surmise that the author intended to do so. To my mind it is doubtful whether this principle applies to Section 103, where the issue is one of obviousness. It would seem that if it is apparent that the prior author has made a mechanical mistake and

that he must have meant something other than what he said, the true meaning, rather than the literal words, should count for the purpose of determining whether the article can fairly be said to have suggested the invention in question. Nevertheless, even if the article counts for this purpose, it seems to me to have only minor significance on the question of obviousness.

I turn now to the Middleton 636 patent entitled "Electrophotographic Plate and Method of Producing Same," issued on December 22, 1953 on an application filed on May 25, 1949. As is to be expected, considering that Middleton was working at Battelle on Xerography, this patent is concerned primarily with a metal plate covered with selenium. Middleton's invention consisted of mixing the selenium in chemicals which, for shorthand purposes, we have called here a resin binder. In essence, the teaching of the patent was that the addition of the binder increased the dark resistance of the mixture. Middleton's specification stated at one point that photoconductive materials other than selenium could be used. He listed several, not including zinc oxide. The patent does not refer to paper as the element to be coated.

Another Battelle worker, Bixby, obtained Patent No. 2,970,906 on February 7, 1961 upon an application filed on August 5, 1955. By a somewhat tortuous process, this filing date can be said to relate back to an earlier date which in turn relates back to a still earlier date so that an initial filing date of July 1, 1948 can eventually be obtained. The patent pertains to Xerography and is concerned with coating a metal plate with selenium. It does not mention zinc oxide. It does, however, state at one point that "suitable backing members" may be made of various different materials including certain metals, glass, plastic and paper.

The three remaining patents are No. 2,647,464 issued on August 4, 1953 to Ebert, No. 2,169,840 issued on August 15, 1939 to Lewis, and No. 2,287,348 issued on June 23, 1942 to Hayden. Ebert was still another Battelle worker on Xerog-

raphy. His patent was not concerned with photoconductive layers. No testimony about it was offered at the trial. It can fairly be said to be unimportant for our purposes.

The other two are in a somewhat different category. The Hayden patent actually deals with coating paper with various "pigments," one of which is zinc oxide suspended in a resin binder. But the purpose of the invention was to make colored paper. It had nothing to do with electrophotography and the photoconductivity of the pigment was in no way involved.

The Lewis patent pertained to a television camera tube. The device made use of an electron gun which bombarded a photosensitive target. The patent listed a number of materials with which the target could be coated, one of which was zinc oxide. However, there is testimony, which I accept, to the effect that the photosensitive layer in a television tube differs significantly from that in electrophotography and that the two cannot be used interchangeably.

Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the leading case on Section 103, directs the court first to determine the "scope and content of the prior art," the "differences between the prior art and the claims at issue," and the "level of ordinary skill in the pertinent art." 383 U.S. at 17, 86 S.Ct. at 694. I have endeavored to summarize briefly the scope and content of the prior art. The difference between it and the claims at issue is not hard to see. None of the prior art taught the use in electrophotography of a layer composed of zinc oxide in a resin binder coated on paper. As to the "level of ordinary skill," presumably this relates to the type of worker in the field and the knowledge of the subject which he can be assumed to possess. In this case we have an unusual situation. Battelle had a sizeable staff of skilled scientists and technicians who for two years were devoting themselves to developing and improving electrophotography. This inevitably involved exten-

sive attempts to discover new materials for photoconductive layers. They did not discover zinc oxide. On the contrary, they tried it and rejected it.

It is suggested that Middleton's 636 patent for the first time revealed that the addition of a resin binder renders suitable in this process a material which would otherwise not be satisfactory because of its inadequate resistance in the dark. The argument is that the Battelle workers who rejected zinc oxide would not have done so if they had appreciated the significance of Middleton's invention. But the fact remains that Middleton himself did not think of zinc oxide as a desirable material to mix with his binder. There is some justness in RCA's remark that "[i]f Middleton did not teach Middleton, how can he be expected to have taught Greig?"

It could almost be said that today the obvious solution of a patent case is to find the patent obvious. Certainly this has been the trend of the recent decisions. But each case must stand on its own facts and each comes down in the end to a matter of judgment. Consideration of the prior art and of the results of the Battelle studies does not persuade me that it was obvious for Greig to hit upon zinc oxide.

Under *Graham*, secondary considerations may also be taken into account. The most important is commercial success. That favors RCA in this case. As of September 1968 every manufacturer of electrophotographic copying machines utilizing zinc oxide-resin coated paper in the United States except SCM held a license from RCA under the 539 patent. Of the manufacturers of electrophotographic zinc oxide-resin coated paper who marketed such paper as of September 1968, seventeen had licenses from RCA and only two, of which SCM is one, had not. The sale of electrofax copying machines and paper therefor has increased markedly since 1962. According to data put in evidence by SCM, the number of copies of zinc oxide-resin coated paper produced by these machines increased from 200,000,000 copies in 1962 to 5,000,-000,000 in 1967.

Although the question may be said to be a close one, it is my conclusion, based upon all the evidence, that the subject matter as a whole of Greig's invention was not obvious at the time of that invention to a person having ordinary skill in the art. I conclude that the 539 patent is not invalid under Section 103.

### SCM's Additional Claims of Unenforceability

These amount to the contention that this court should not enforce the patent as against SCM because RCA has misused it as to others, *i.e.*, (1) the United States Government, and (2) RCA's licensees.

The basis for the first of these contentions is a contract dated July 31, 1950 between RCA and the United States in which RCA undertook to do research work for the Army Signal Corps over a period of twenty-one months from November 1, 1950 to July 31, 1952 on "electronic scanning techniques and method of facsimile recording."

In this contract RCA agreed to grant to the government a royalty-free license to every "subject invention." That phrase was defined as an invention conceived "in the performance of the experimental, developmental or research work called for under this contract * * * or relating to the subject matter of this contract which was done upon the understanding that a contract would be awarded." SCM asserts that Greig's invention comes within this provision. Concededly RCA has never granted a royalty-free license to the government under the 539 patent.

If SCM had proved this contention as a matter of fact, there would be a serious question of law as to whether SCM has standing to raise this question. It would seem that any breach by RCA of a contract with the government would merely give rise to a cause of action on the part of the government. It would extend the doctrine of unenforceability very far to say in effect that because the govern-

ment did not get a royalty-free license to which it was entitled, SCM and every one else may use the patent without payment for such use. None of the cases cited by SCM goes that far.

■ I deem it unnecessary to decide this question because the evidence seems to me insufficient to raise it squarely. The nature of RCA's work for the Signal Corps on facsimile recording was never explained in any detail. To be sure it does appear that the work of Battelle on Xerography was thought to have some bearing on it. The contract provided that RCA should include in its investigation "comprehensive studies of Xerography." Just what bearing Battelle's Xerographic researches had upon RCA's investigation of facsimile was not made clear.

Regardless of the extent of the connection between Xerography and facsimile, the fact appears to be that Greig did not work on the facsimile investigation. He stated expressly in his "disclosure" of his invention that it had not been made in the course of work on a government contract. SCM has offered no evidence to show that there is any connection between Greig's invention of the photoconductive zinc oxide layer and "electronic scanning techniques and method of facsimile recording." Upon all the evidence I find that SCM has not proven that Greig's invention was conceived in the course of the performance of the Signal Corps contract. I conclude, therefore, that the fact that RCA did not grant the government a royalty-free license under the 539 patent is irrelevant. That fact does not make the patent unenforceable as against SCM.

The basis for the second contention is that the 539 patent, as previously pointed out, contains two types of claims, the process claims (Nos. 1–13, 20 and 21), and the product or "paper" claims (Nos. 14–19 and 22). It has been RCA's practice to license copy machine manufacturers under the process claims and paper manufacturers under the paper claims. SCM contends that RCA has thus charged a double royalty and that it has thereby unlawfully extended its patent monopoly, with the consequence that the patent is

unenforceable against either type of licensee.

■ I do not accept this contention. Each claim is in effect a separate patent. Assuming that a claim is otherwise valid, RCA is entitled to charge a royalty on each.

SCM, to be sure, contends that the paper claims are invalid because they attempt to define a product, i.e., the paper coated with the zinc oxide mixture, in terms of a process, i.e., such a paper to which an electrostatic charge has been applied. Concededly, the coated paper bears no such electrostatic charge when it leaves the hands of the paper manufacturer. The charge is applied later in the course of the process of making the copy.

■ No court has ever held the paper claims invalid on this ground. It is not necessary that this court now determine that question. For present purposes the point is that a patentee has a right to go on charging royalties for the use of his patent until a court has determined that his patent is invalid. He is entitled to rely on the presumption of validity. To do so is not a "misuse" of his patent. I conclude therefore that the fact that RCA has charged royalties to these respective types of licensees under the respective claims applicable to each group does not, in itself, render the patent unenforceable as against SCM.

### Infringement

■ Since I have held the 539 patent to be invalid and unenforceable for the reasons previously discussed, it is theoretically unnecessary to consider the question of infringement. I do so, however, for the sake of completeness.

SCM since 1962 has manufactured and sold a copying machine. Since 1967 it has also manufactured paper, i.e., coated it with a zinc oxide-resin layer and sold this coated paper for use in its copying machine. In the course of the copying process, the machine applies the electrostatic charge to the paper. SCM had a license from RCA for the machine

until it cancelled that license in 1965. It never had a license for the paper.

RCA contends that the machine infringes Claims 1 and 21 of the patent and that the paper infringes Claim 17. Strictly speaking, this is contributory, rather than direct, infringement. It is SCM's customer who uses the process and the paper and who thereby directly infringes the patent, if he is not properly licensed. SCM contributes to and induces that infringement by providing the customer both with the process and with the paper. Since SCM is not licensed by RCA, it cannot pass on that license to its customers, as licensed machine and paper manufacturers do.

The evidence overwhelmingly supports RCA's contention. Indeed, SCM does not seriously dispute it. The evidence establishes that SCM's machine employs RCA's electrofax process as described in Claims 1 and 21 and that SCM's paper, when charged in the course of that process, embodies all the features of Claim 17. I so find. I conclude that if the 539 patent were valid and enforceable, RCA would have a valid cause of action for infringement.

### The 540 Patent

This patent No. 3,052,540 is entitled "Dye Sensitization of Electrophotographic Materials." It was issued on September 4, 1962 to RCA as assignee of the applicant, Harold G. Greig. The original application was filed on June 2, 1954. This application was later abandoned and a continuation-in-part application was filed on April 20, 1959. The invention is an improvement on the process set forth in the 539 patent. The original application was filed some two years and eight months after the filing of the original 539 application, the applications for the respective patents were thereafter prosecuted concurrently in the Patent Office, and the two patents eventually issued on the same day.

The invention of the 540 patent consists of the addition of one or more organic dyes to the electrofax layer, i.e., the mixture of zinc oxide in a resin

binder described in the 539 patent. The purpose of doing so is to increase the "spectral response" of the layer, i.e., its conductivity when exposed to light. The layer described in the 539 patent contains no dyes. As previously noted, its "peak response" is to utraviolet light of a wave length of about 3750 A to 3900 A. This light is not visible to the human eye. When one or more dyes are added to the layer, an additional peak response is obtained in the vicinity of 5500 A. This is light from that part of the spectrum which is visible to the human eye. It is light given off by an ordinary incandescent lamp. The result is that when the layer containing the dyes is used in the electrofax process, parts of the document to be copied which are in color visible to the eye, such as red or blue, appear on the copy. Without using the dyes, the colored portions are not reproduced.

The addition of the dye "sensitizes" the zinc oxide-resin mixture. "Sensitize" is defined in the patent specification as follows:

"By 'sensitize' is meant capable of absorbing radiant energy in a band of wave-lengths to which zinc oxide particles are substantially insensitive and transferring said absorbed energy to the photoconductive white zinc oxide particles to produce a change in the conductivity of said zinc oxide particles."

The molecules of the dye which absorb the colored light are said to be "adsorbed" by the zinc oxide, that is, they cling to the zinc oxide and cause it to respond to, i.e., to conduct electricity when exposed to, wave lengths of light which it would not otherwise respond to.

The 540 patent contains fourteen claims. Each of them is on "a recording element for electrostatic photographic printing." For present purposes it is sufficient to say that the claims differ from one another primarily with respect to the dye or dyes to be added to the zinc oxide-resin layer in order to obtain the sensitizing effect. The

broadest claims refer only to "at least one optically sensitizing dye," without saying what it is. The narrower claims refer to a specific dye, notably rose bengal or erythrosin or fluorescein, or to a combination of these plus other dyes. The specification lists by name twenty-nine dyes which are said to "sensitize the photoconductive white zinc oxide-binder recording element."

The claims do not go into any detail about the photoconductive white zinc oxide-binder. They do not mention the "$10^{-9}$" criterion heretofore discussed at length with respect to the 539 patent. The specification, however, refers to application No. 383,677, the continuation-in-part application filed on October 1, 1953 for the 539 patent. It states:

> "By special test disclosed in patent application Serial No. 383,677, op. cit., the semiconductive and photoconductive white zinc oxides may be distinguished by value of surface photoconductivity. The photoconducting white zinc oxides all have a value of surface photoconductivity higher than $10^{-9}$ ohms$^{-1}$/square/watt/cm.$^2$; whereas the semiconducting white zinc oxides all have values below this value."

SCM contends that each of the claims is invalid on each of the possible grounds, Section 101, Section 102, Section 103, Section 112, and fraud on, or nondisclosure to, the Patent Office. I have concluded that some of these contentions have merit and that others do not. I shall consider each in turn.

### Section 101

 This section says that "whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." SCM contends that the 540 patent is invalid under this section because it does not disclose a new and useful invention or a new and useful improve-ment. SCM argues that the 540 adds nothing of significance to the 539 and hence that RCA is guilty of "double patenting."

This argument impresses me as unsound. It is clear that the 540 patent does add something useful, *i.e.*, the sensitizing dyes, to the zinc oxide-resin layer disclosed by the 539. SCM's argument is a play on words. It is really contending that the addition of the sensitizing dye was obvious. This is a subject to be considered under Section 103, which provides an adequate statutory foundation for a determination of that question. To phrase the contention in terms of Section 101 merely confuses the issue. I conclude that the 540 patent is not invalid under this section.

### Section 102

 There is no serious problem here. The invention disclosed in the 540 patent was not "identically disclosed" by the prior art.

 SCM has made an additional contention under this section. It argues that the patent is invalid under Section 102(f) because Greig "did not himself invent the subject matter sought to be patented," as that section requires. SCM maintains that Greig was not the inventor because the idea of adding sensitizing dyes was not original with him but was suggested by others and by the prior art.

Here again this is merely the claim of obviousness in another guise. It is clear from the evidence that it was Greig who did the work which led to the issuance of the 540 patent. He was the inventor of the invention which that patent disclosed. I conclude that the patent is not invalid under Section 102 in general or under Section 102(f) in particular.

### Section 103

 This brings us to the issue of obviousness. Most of the evidence on the 540 patent was devoted to this question, which is the most important one

on this branch of the case. That evidence may be briefly recounted as follows.

Greig began his work of adding organic sensitizing dyes to the zinc oxide-resin layer on May 27, 1953. He continued until he filed with RCA's patent department his formal disclosure of the invention on November 11, 1953. He engaged in this work because he was well aware of the fact that the zinc oxide-resin layer as described in the 539 application then pending responded only to utraviolet light, and that the electrofax invention would be more useful if a way could be found of supplementing the spectral response of the layer by another response in the range of the visible spectrum.

It was a well-known fact in 1953 that the addition of sensitizing dyes to the silver halide emulsion used in conventional photography would cause the emulsion, otherwise responsive primarily to ultraviolet light, to respond to light in other wave lengths, i.e., wave lengths at which the dye absorbed light. This fact was revealed in the literature on the subject, notably in a book by E. J. Wall entitled "The History of Three-Color Photography," published in 1925, and in an article by West and Carroll, published in 1947, entitled "Photo-Conductivity in Photographic Systems." Greig, a chemist by profession, had had considerable experience with dyes and had worked in the field of photography in his earlier years. He was familiar with this principle as applied to photography.

Other people were familiar with it also. In his first notebook entry on this subject on May 27, 1953, Greig recorded that:

"The question, will an organic dye of the type used by the photographic industry sensitize the electrophotographic paper, has been asked by quite a few persons upon viewing electrostatic printing."

In addition to these unidentified persons, another scientist in RCA's employ, Sugarman, suggested it to Greig at about this time. Based upon his knowledge of the literature, Sugarman thought it reasonable to expect that "certain dyes would sensitize any photoconductor, just as they sensitize silver halide." [18]

Moreover, before Greig began his operations, there were indications that the principle could be applied, not only to photoconductors in general, but to zinc oxide in particular. Shortly before this time Thomsen, another RCA scientist, had invented a red or pink zinc oxide which exhibited this enhanced spectral response. He finally obtained a patent on it which figures in another aspect of the case to be discussed hereinafter. Greig was aware of it but he considered that the process of making a colored zinc oxide was too expensive for practical purposes. What he wanted to do was to sensitize his white zinc oxide-resin mixture.

Of perhaps greater importance was a series of articles reporting experiments made in and before 1950 by two Russian scientists, Putseiko and Terenin. These articles were summarized in a journal called "Chemical Abstracts" with which Greig was familiar. The Russians made photoconductivity tests on zinc oxide stained with various dyes and found that it exhibited a sensitized photoconductivity in the wave length at which the dyes absorbed light. The zinc oxide used in the Russian experiments, however, was not suspended in a resin binder.

Armed with this information, and stimulated by the questions and suggestions of his colleagues, Greig started work by adding two dyes to his electrofax layer and making prints to observe the result. The first two dyes that he tried on May 27, 1953 were fluorescein

18. Sugarman was experimenting at the time with colored photoconductors which had conductivity in the range of visible light. He and another RCA employee filed a patent application on this invention on October 1, 1953. Greig was aware of it. The materials used by Sugarman, however, did not include zinc oxide.

and tetra-brown-fluorescein. These were dyes that had been used as sensitizers in silver halide photography. The resultant prints were reasonably good. Greig noted in his notebook that the prints indicated that "there is a possibility of sensitizing with an organic compound," but that "more work will be done to follow this lead."

In 1953 over 5,000 organic dyes were commercially available. All in all, Greig tried approximately fifty. He found that twenty-nine worked well on the electrofax layers. These are the dyes listed in the 540 patent. All of them were well-known dyes and all had been tried at one time or another to sensitize and increase the spectral response of a photographic emulsion. Some of them had proved to be useful for that purpose and some had not. There is some correlation, by no means complete, between the dyes in the 540 patent and the dyes listed in Wall's 1925 book on color photography.

Through the course of Greig's 1953 experiments, the zinc oxide-resin mixture remained unchanged. What Greig did, in substance, was to add first one dye and then another, and sometimes a combination of one or more, to the mixture and see how it worked. It was a trial and error method, similar to that which he had employed in his earlier investigations on the 539 patent in determining which zinc oxides were useful and which were not.

When the application for the 540 patent was filed on June 2, 1954, it immediately ran into trouble. All claims were rejected by the Examiner and RCA's responses did not persuade him to change his mind. RCA finally abandoned the original application and filed a continuation-in-part on April 20, 1959, almost five years after the first application. Again the Examiner rejected the claims. He cited various patents which it is unnecessary to discuss in detail here. He also relied on various articles, notably the Putseiko articles and Chemical Abstracts. Without attempting a blow by blow account of these long drawnout proceedings, it is fair to say that the Examiner's position, in substance, was that the invention was obvious.

At long last, however, he changed his position. The file wrapper says that RCA representatives conferred with him on April 25, 1962. According to RCA's statement in the file, "the interview was held in view of the desirability of disposing of the subject application at the same time as application Ser. No. 383,677, filed October 1, 1953, which has been allowed." This sentence refers to the product claims of the 539 application which, as we have seen, were finally granted after the United States District Court for the District of Columbia, in January 1962, had suggested that RCA and the Patent Office make another effort to resolve their differences. In the light of this background, the Examiner appears to have given up in the 540 case without a struggle. Shortly after the interview, without further comment except as to minor details, he granted the patent, which then issued simultaneously with the 539 on September 4, 1962.[19]

In my opinion the Examiner's original position was correct and he was ill-advised to change it. In the words of Section 103, "the differences between the subject matter sought to be patented and the prior art" were such that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." Greig was such a person. It was certainly obvious to him, as well as to several other people, that the subject matter sought to be patented, i.e., the sensitizing of his photoconductive layers by the addition of dyes, was strongly suggested by the prior art.

RCA argues that problems peculiar to the zinc oxide-resin mixture were so dif-

19. The effect of the Rule 131 affidavit filed by RCA at this point will be considered in discussing SCM's fraud claim infra.

ferent from those presented by zinc oxide alone, without a binder, or by a silver halide emulsion, as to deprive the prior art of significance. I am not persuaded that this was the case. Granted that some of the dyes which were useful in the prior art did not work well in electrofax, the fact remains that many of them did. In the short space of a few months, by experimenting with only some fifty well-known dyes, Greig satisfied himself that twenty-nine of them produced the desired effect in electroflax. Doubtless this was a valuable improvement upon Greig's white zinc oxide mixture as first conceived, but it was not, in my opinion, an original contribution to the art.

The secondary considerations mentioned in Graham v. John Deere Co., *supra*, commercial success and the like, are not strong enough in this instance to overcome the fundamental lack of invention. It is not practicable, in any event, to determine how much of the commercial success of the electrofax process is attributable to the 540 patent as distinct from the 539.

Upon all the evidence, I conclude that the 540 patent is invalid under Section 103.

## Section 112

■■■ I have already held, for the reasons previously mentioned, that the 539 patent is invalid for failure to comply with the requirements of this section. It necessarily follows that the 540 patent is also invalid on that ground.

Each of the claims calls for the use of "photoconductive white zinc oxide." In this respect the claims resemble claim 1 of the 539 patent. I have held that that language in the 539 patent was too broad to "distinctly claim the subject matter" of the invention, as required by Section 112. The language is too broad in the 540 patent as well.

Moreover, the specification of the 540 states that a photoconductive white zinc oxide is one having a surface photoconductivity higher than $10^{-9}$ ohms$^{-1}$/ square/watt/cm.$^2$. It incorporates by reference, in effect, the test for determining surface photoconductivity described in the application for the 539 patent. Reading the claims of the patent in the light of this specification does not save the patent, for as has been previously pointed out, the $10^{-9}$ criterion is wrong and the description of the surface photoconductivity test in the 539 patent is defective in its failure to specify the type of light used.

Of course, the 540 patent, being an improvement patent, is primarily concerned with the improvement, *i.e.*, the sensitizing dyes. As far as the basic invention is concerned, it relies on the 539. In so doing, it is necessarily affected by the inadequate specification of the 539 even though that specification does not refer to the improvement. I see no escape from the conclusion that the 540 patent is invalid under Section 112. I so hold.

## The Alleged Fraud Upon or Nondisclosure to the Patent Office

■■■ SCM's principal contention in this respect relates to the Thomsen patent. The facts relevant to this claim are substantially undisputed. They are as follows.

On October 21, 1953 Greig's fellow RCA scientist, Thomsen, applied for a patent on his process of preparing a so-called red zinc oxide which is "panchromatically sensitive," *i.e.*, photosensitive over the entire range of the visible spectrum. This is the zinc oxide previously mentioned which Greig considered too expensive for practical purposes. The patent, No. 2,727,808, issued on Thomsen's application on December 20, 1955. It contained only two claims, each relating to a method or process for making this particular zinc oxide. The specification referred to Greig's then pending application for the 539 patent and pointed out that Greig's white zinc oxide-resin binder mixture had a more limited spectral sensitivity than Thomsen's red zinc oxide. Although the speci-

fication thus referred to Greig's application, the claims of Thomsen's patent did not embrace either Greig's 539 or his 540 invention. During the course of the proceedings in the Patent Office on Greig's application for the 540 patent, the Examiner cited Thomsen's patent, among others, in rejecting Greig's claims.

Rule 131 of the Rules of Practice in Patent Cases, as far as pertinent, provides:

"When any claim of an application is rejected on reference to a domestic patent which substantially shows or describes *but does not claim* the rejected invention, * * * and the applicant shall make oath to facts showing a completion of the invention in this country before the *filing date* of the application on which the domestic patent issued, * * * then the patent * * * cited shall not bar the grant of a patent to the applicant * * *." (Emphasis added)

RCA made use of this rule. In May 1962 it filed an affidavit sworn to by Greig on May 4, 1962, in which he stated in substance that he had conceived his 540 invention and had successfully tested it prior to October 21, 1953, the date when Thomsen filed his application. He attached copies of pages of his notebook recording print tests made by him with electrofax layers to which various dyes had been added. Although, for some reason, the dates appearing on these pages were obliterated, the affidavit stated that all the dates were earlier than October 21, 1953.

Perhaps this affidavit influenced the Examiner. He granted the application shortly thereafter. He did so, however, without specifically referring to the affidavit or to the Thomsen patent or, for that matter, to any of the other patents or articles which he had previously cited. The Examiner gave no explanation for his sharp change of position.

Every statement in Greig's affidavit was true. There was no affirmative misrepresentation in it. SCM contends, however, that Greig and RCA were guilty of intentional nondisclosure of a material fact in that the affidavit did not state that Greig had conceived his invention after Thomsen had *completed* his, although before Thomsen *filed* his application for a patent. It is true that Thomsen made his invention first and that Greig and RCA were aware of that fact. But under Rule 131 it is the date of filing of Thomsen's application, not the date of his invention, that is the critical date. The affidavit correctly set forth the information which the rule requires.

It is purely conjectural to say that if the Examiner had been told that Thomsen made his invention first, he would not have granted the patent to Greig. To my mind this is highly unlikely, for Thomsen's invention really had little or nothing to do with Greig's. In my opinion the doctrine of unclean hands does not apply here. I conclude that there was no fraud or intentional nondisclosure of a material fact on the part of RCA in filing its Rule 131 affidavit. The patent is not unenforceable on this ground.

SCM's other claims of unclean hands based on various arguments made by RCA's attorneys to the Patent Office and on RCA's failure to inform the Patent Office of the Battelle reports seem to me to be manifestly without merit and to require no discussion. Nor do I accept SCM's suggestion that RCA's dealings with the Patent Office in connection with the 539 application should render the 540 patent unenforceable. As far as the 540 patent is concerned, I find and conclude that RCA was not guilty of either misrepresentation or of intentional nondisclosure.

The conclusions which I have reached with respect to the obviousness of the 540 invention, with respect to the Rule 131 affidavit, and with respect to SCM's contention that Greig was not the inventor, are in accord with those in the recent case of Nashua Corporation v. RCA Corporation, 307 F.Supp. 152 (D.N. H.1969), aff'd, Nashua Corporation v.

RCA Corporation, 431 F.2d 220 (1st Cir. 1970), which involved the same contentions with respect to this same patent. I may say that I have based my conclusions solely upon the evidence before me and have arrived at them independently of the decision in the *Nashua* case.

### Infringement

■ SCM concedes that the coated paper which it manufactures infringes Claims 1, 2 and 3 of the 540 patent.[20] RCA contends that SCM infringes Claim 4 as well. Whether it does or not depends on whether SCM has used in its paper coating any of the dyes listed in Claim 4. One of those dyes is "auramine O." This is the same as a dye used by SCM which it calls "auramine yellow." SCM offered testimony to the effect that it used this dye only to affect the color of the paper, not to sensitize the zinc oxide-resin layer. In its answers to RCA's interrogatories, however, SCM admitted that it used auramine yellow in its paper as a "sensitizing dye." The testimony on this subject was not convincing and in any event SCM is bound by its admission. I find that SCM has used auramine yellow for sensitizing purposes and has thereby infringed Claim 4. If the 540 patent were valid, therefore, RCA would have a valid cause of action for infringement.

### The 883 Patent

Patent No. 2,922,883 is entitled "Electrostatic Charging Means and Method." It was issued on January 26, 1960 to RCA as the assignee of Edward C. Giaimo, Jr., on an application filed on March 3, 1955. It contains six claims. Despite its title, which refers to "means and method," all the claims are on an apparatus, i. e., the "means." There are no "method" or process claims. This is the device which applies the electrostatic charge to the coated paper, as mentioned earlier in this opinion. The coated paper is referred to in the patent as a "chargeable member."

The charge is applied by the use of two "corona discharge devices," sometimes referred to as "corona chargers." Since there are two of them, the device is frequently called a double corona charger. A corona charger is an electrode consisting of a set of fine parallel wires connected with a power supply which produces very high voltage. The wires are supported on a frame of insulating material. The high voltage in effect fractures the molecules of the air, producing a "corona" or cloud of tiny ions charged with electricity. If the wires are connected with the negative terminal of the power supply, the charge on the ions is negative. Conversely, if the wires are connected with the positive terminal, the charge on the ions is positive. In the Giaimo apparatus, one charger is positioned above the chargeable member, i. e., the coated paper, and the other beneath it. The paper passes between the two chargers with its coated surface on top. The top charger deposits negative ions on the top coated surface of the paper, thereby imparting to the coated surface a negative electrostatic charge. The bottom charger deposits positive ions, i. e., a positive charge, on the bottom, i. e., the uncoated back of the paper.

The two chargers, with the paper between them, are enclosed in a metal box or "shield." The shield is connected with the ground so that it is of "zero potential," i. e., it bears no electrical charge. There are slots in the shield through which the paper enters and emerges as it passes between the chargers. According to the specification of the patent, the purpose of the shield is to "confine the corona discharge or ion cloud to the operating area."

SCM contends that each of the claims of this patent is invalid under Sections 102 and 103. It also contends, rather more vigorously than it did with re-

---

**20.** In this instance the infringement is direct rather than contributory, for the claims of the 540 patent, unlike the 539, do not define the paper in terms of one bearing an electrostatic charge.

spect to the other patents, that in any event, the SCM Model 33 copy machine does not infringe the patent. RCA, on the contrary, maintains that the patent is valid and that SCM's machine infringes Claims 3 and 4.

## Section 102

 It is clear that Giaimo's apparatus was not "identically disclosed" in the prior art. SCM argues that a device for removing electrostatic charges from yarn disclosed in Patent No. 2,497,604 issued to Henry on February 14, 1950, contains all the elements of Giaimo's invention and that therefore Section 102 applies. I do not accept this argument. Henry's device is constructed differently from Giaimo's and it is intended for a different use. Whatever the relevance of this patent may be under Section 103, it is not such an identical disclosure as to invalidate the 883 patent under Section 102.[21] I conclude that the 883 patent is valid under this section.

## Section 103

 There are only a few prior patents which relate to this issue but nevertheless the question which they present is difficult. Before discussing them in detail, the background of Giaimo's invention should be explained.

The imparting of an electrostatic charge to a photoconductive layer by means of a corona charger was well known for some years before Giaimo invented his apparatus in May 1954. It had been used in Xerography, and workers in that field, notably Carlson, Schaffert, and Walkup, had applied for and eventually obtained patents on apparatus for that purpose. RCA itself had used a corona charger in its original work on electrofax.

These earlier inventions, however, all employed one corona charger, not two. The chargeable member, in the case of

Xerox the coated selenium plate, and in the case of electrofax the coated paper, was placed on a conductive grounded metal plate, referred to as a "backing member." The single corona device then placed the charge on the top surface of the photoconductive layer. According to Giaimo's specification:

> "It is believed that the useful effect of the conductive backing was the production of a zero potential surface at the interface between the photoconductive layer or coating and the backing member."

This method was not entirely satisfactory, due primarily to the difficulty of securing a completely uniform contact between the chargeable member and the backing member, i. e., in the case of electrofax between the paper and the plate. The result was that the top surface of the coated paper was not charged evenly. There were other difficulties as well, such as the adverse effect of very dry paper, a tendency of the paper to stick to the plate, etc.

For some years prior to May 1954, scientists at RCA had attempted without success to devise a better method of charging. Similar efforts in the field of Xerography were going on at the Haloid Company, the owner of Xerox. In April 1954 Giaimo at RCA hit upon the double charger device which he completed in May. His formal patent disclosure sheet is dated June 17, 1954.

In substance what Giaimo did was to eliminate the backing plate. Instead, by employing the second or bottom charger, he placed a positive charge on the bottom or back of the paper while the top charger deposited the negative charge on the top coated surface of the paper. The effect of these two opposing charges on the opposite sides of the paper was to produce "a zero potential plane in the interior of the chargeable member," just as the conductive backing plate had done, but without the disad-

---

21. SCM has apparently abandoned the contention made in the pretrial order that the patent is invalid under Section 102(f) because Giaimo was not the inventor. There is no support in the evidence for this contention.

vantages which the use of the backing plate had entailed.

By a curious coincidence, a few months later Gundlach, a scientist employed by Haloid, had the same idea and devised a substantially similar apparatus.

Giaimo applied for a patent on March 3, 1955. Gundlach applied for one on August 1, 1955. It was inevitable that an interference proceeding should take place. Giaimo established his date of invention as earlier than Gundlach's. In August 1958, Gundlach abandoned the contest.[22]

In the course of the interference proceeding, Gundlach challenged Giaimo's invention on the ground that it was unpatentable because it was obvious, in view of various prior patents, including the patent to Henry. On November 29, 1957, the Interference Examiner granted Gundlach's motion to strike two of Giaimo's claims originally involved in the interference, holding that those claims did not "patentably distinguish" over the prior art. The Interference Examiner, however, also granted a motion by Giaimo to add to the interference proceeding another claim, No. 21, and he went on to hold that that claim was "considered patentable over the art cited." Gundlach moved for reconsideration of this decision. On January 31, 1958, the Interference Examiner denied the motion with an opinion in which he noted that:

> "The charging of a xerographic plate wherein the backing member is an insulator has presented a problem to workers in the art."

He said that:

> "The combination claimed as per proposed count G [Claim 21] includes some elements that may be old in other arts and elements that perform a new function. The art is devoid of a teaching as to the use of shield means for the purpose of directing a charge to a surface and the fact that

the art of record does not teach the charging of a member in electrostatic photography by apparatus of proposed count G cannot be ignored. None of the references are concerned with the problem of uniformly charging a chargeable member and none of the references show charging by the apparatus as claimed."

The Interference Examiner concluded that "proposed count G is patentable."

Giaimo's application had a faster and easier progress through the Patent Office than either the 539 or the 540. As early as November 2, 1956, only one and one-half years after the application was filed, the Examiner allowed certain claims, subject to the outcome of the foregoing interference proceeding. After the interference proceeding ended in August 1958 in Giaimo's favor, there ensued the usual action and reaction between the Examiner and RCA. RCA amended some claims, added new ones, and cancelled others. After the comparatively short period of less than a year, the Examiner allowed six claims on June 30, 1959. The patent issued on January 26, 1960. Claim No. 21 in the interference proceeding, which the Interference Examiner had held to be patentable, became, after a subsquent minor amendment, Claim 6 in the patent as allowed and issued.

One of the two patents upon which SCM places its principal reliance on the question of obviousness is Patent No. 2,497,604 issued to Henry on February 14, 1950, on an apparatus for eliminating electrostatic charges on yarn. The device consists of an elongated metal cylinder containing two parallel rods studded with very prickly sharp needles. The cylinder is grounded. The rods are electrodes, one connected to a high positive voltage, the other to a high negative. Corona discharges are emitted from the needle points, filling the cylinder with positive and negative ions. To prevent

---

22. Gundlach actually obtained Patent No. 2,885,556 issued on May 5, 1959 but this was a somewhat different device employing AC current. Giaimo's and Gundlach's original invention employed DC current.

the ions from combining and neutralizing each other, an insulating cellulose acetate sheet is placed between the two electrodes. One side of the cylinder is open. The yarn passes by outside the device, not through it. The ions spill out through the open side and destroy electrostatic charges on the surface of the yarn which were generated in the course of the yarn's manufacture.

The testimony shows that the elements of this device correspond to the elements of Giaimo's. The cylinder corresponds to the shield. The parallel rows of needle points correspond to the parallel wires.[23] The cellulose acetate sheet between the rows of needle points corresponds to the coated paper between the parallel wires. In the course of its operation, the parallel rows of needle points deposit a negative electric charge on one side of the intervening sheet and a positive charge on the other.

In an interesting demonstration conducted in the courtroom, it was shown that if a sheet of coated paper is inserted in Henry's device in lieu of the cellulose acetate sheet, a print can actually be made with it. To do so, however, requires ten seconds. This is far too slow to make the device of any practical significance in a copying machine, in which the making of a print requires only a small fraction of one second.

Despite the fact that Henry's device can be made to do the work of Giaimo's, albeit so slowly as to make it useless for practical purposes, it is undeniable that Henry's device was intended to accomplish a wholly different end. The function of the cellulose acetate sheet or "divider," was intended by Henry merely to increase the efficiency of the device in spewing out ions on to the passing yarn. Indeed, where the electrodes are spaced far apart in Henry's device, no divider sheet is necessary and none is in fact used. It is merely a coincidence, so to speak, that positive and negative charges are deposited on opposite surfaces of the divider when it is used. It is not the object of the invention to charge the sheet and no attempt is made to spread the charge evenly upon it. Henry's device has nothing to do with photoconductive layers.

The other patent upon which SCM relies is Patent No. 2,662,833, issued on December 15, 1953 to Helmuth. This covers an electrostatic apparatus and method for applying a coating, such as paint, to the exterior surfaces of a hollow object, such as a glass bottle. Helmuth employed an electrode giving off a corona discharge of negative polarity on the outside of the bottle and another giving off a charge of positive polarity at the mouth of the bottle, so placed that this charge went inside the bottle. This facilitated the depositing of the coating of paint evenly on the outside of the bottle. This method eliminated the need for a "backing electrode" inside the bottle. It had been found difficult to insert such an electrode in bottles of peculiar shape. Also, it was difficult to conform the backing electrode to the irregular surface of the bottle.

Here we have two corona charging devices with a member between them, i. e., the wall of the bottle. Charges of opposite polarity are deposited on the respective surfaces of that wall. Here again, the invention is not concerned with photoconductive layers. The Helmuth patent is not cited in the 883 patent nor was it cited by Gundlach in support of his motion in the interference proceeding.[24]

In considering the issue of obviousness, it is of no real moment that a single corona discharging device consisting of fine wires or of needle points was well known, or that the use of such a device for charging photoconductive layers was well known. The problem which both RCA and Haloid were working on was to improve upon that device for that pur-

---

23. It is well known that a series of needle points is the equivalent of a set of fine wires as a means of producing a corona discharge when subjected to high voltage.

24. The other patents mentioned by SCM do not add enough of significance on the issue of obviousness to require discussion.

pose. The solution that each of them finally came up with was to use two corona charging devices. This was a novel solution, as far as charging photoconductive layers was concerned. As the Interference Examiner said, "the art of record does not teach the charging of a member in electrostatic photography" by such an apparatus. The vital question is whether this solution was made obvious to one of ordinary skill in the art by the Henry or Helmuth patents, in each of which double corona chargers were used for a purpose other than the charging of photoconductive layers.

Despite all the emphasis placed upon it by SCM at the trial, I think it doubtful whether the Henry patent can be said to have made the solution obvious. The Interference Examiner, who was aware of the Henry patent, thought that it did not, and I am inclined to the view that he was correct in so holding. The parallel between Henry's device and Giaimo's is close, superficially, but the fact remains that it was not Henry's purpose to charge the divider sheet, which was included (when it was included) for a wholly different reason.

The Helmuth patent, however, is another matter. There it was the inventor's objective to achieve "a uniform application of the coating material" to one surface of the chargeable member, i. e., to the outside of the bottle. Helmuth accomplished this by the use of two corona devices.

The Interference Examiner said:

"None of the references are concerned with the problem of uniformly charging a chargeable member."

But the Helmuth patent was not one of the references which was furnished him. Helmuth was concerned with that particular problem, the same problem which concerned Giaimo and Haloid.

Moreover, Helmuth employed the second corona charger to overcome a difficulty very similar to that which confronted Giaimo, i. e., the fact that without such a second charger, the charge would not spread evenly on the chargeable member because there was not a completely uniform contact between the chargeable member, i. e., the bottle or the coated paper, and the backing member. Helmuth's device, to be sure, is constructed differently from Giaimo's in detail. But the problem that it solved was similar to Giaimo's and it solved that problem in a similar way by using two corona discharging devices, one placing a charge of one polarity on one surface of the chargeable member, and the other placing a charge of opposite polarity on the opposite surface.

Helmuth's patent was issued on December 15, 1953. Within five months thereafter, Giaimo, who had been working on this problem for some time, conceived his invention. Within less than a year thereafter, Gundlach, who had also been working on the problem, presumably independent of Giaimo, also conceived the same invention. Giaimo and Gundlach were both persons of ordinary skill in the art. The fact that Giaimo and Gundlach each had the same idea does not necessarily make this idea obvious, although it is a circumstance which cannot be overlooked. But the fact that each conceived the idea within a relatively brief time after Helmuth's invention became known is to my mind significant. It could well have occurred to each of them that their problem, which was similar to Helmuth's, could be solved in a similar fashion. All that then remained to be done was to design the apparatus to accomplish this objective for their particular purpose, i. e., to deposit a charge evenly upon a coated paper or a selenium plate instead of upon a glass bottle.

The fact that the object to be charged in the case of Giaimo and Gundlach was a photoconductive layer, whereas Helmuth's glass bottle was not photoconductive, does not destroy the parallel between the two. The problem in each case was an electrical problem, which was the same whether or not the particular member to be charged was photoconductive. Moreover, it is worth noth-

ing that Giaimo's patent specifically mentions that the member carrying the photoconductive coating need not be paper, but may be glass.

Secondary considerations here are not very helpful. It is not practicable on the evidence to determine how much of the success of electrofax is attributable to Giaimo's invention, which deals with merely one step in the process.

The question is a close one. It is my conclusion upon all the evidence that Giaimo's invention was obvious to persons of ordinary skill in the art. I so find. It follows that the 883 patent is invalid under Section 103.

### Infringement

 The copying machines which SCM manufactures and sells employ two corona discharge devices, i. e., a double corona charger. SCM has never taken a license under the 883 patent. RCA contends and SCM denies that SCM's charger infringes claims 3 and 4 of the patent.

In the 883 patent, as already mentioned, the two corona devices are surrounded with a box-like shield. SCM's machine has two shields, one around each of the two sets of corona wires. The two are connected, however, by metal straps. These straps make them electrically a single unit. Both are at the same potential. They are the equivalent of RCA's single shield. This slight difference in physical structure, therefore, is immaterial.[25]

RCA's shield is connected with the ground. It therefore has a zero potential. It continues at zero whether or not paper is passing between the corona wires. SCM's two shields, on the contrary, are not grounded. They bear a low potential. When the paper passes between the wires, the potential fluctuates.

SCM contends that claims 3 and 4 of the patent are limited to an apparatus

having a grounded shield and hence the claims do not embrace SCM's double corona charger. Claims 3 and 4 do not literally state that the shield or shields are grounded. They say that the apparatus contains "connection means associated with said shielding structures for applying thereto a reference potential between said high positive and high negative potentials." SCM argues that "reference potential" means zero potential, i. e., that the shield is connected with the ground, and that this meaning is emphasized when the language is read in connection with the specification which expressly states that the shield is "grounded electrically."

Although the term "reference potential" is broader than the term "zero potential" or "grounded," nevertheless it seems to be true that the 883 patent, fairly construed, intends the terms to be synonymous. Moreover, RCA has not established that the variable potential which exists on SCM's shields can properly be called a reference potential. I find, therefore, that there is in fact a difference between SCM's device and RCA's in this respect.

The question is whether this difference is significant on the issue of infringement. RCA contends that it is not. It contends that the doctrine of equivalents applies, i. e., that SCM's charger performs substantially the same function as RCA's in substantially the same way and obtains the same result. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

This is certainly true, as far as the difference in the structure of the shields is concerned. And I take the view that it is also true with regard to the difference in potential on the shields. This difference does not affect the functioning of the devices. Not only do both chargers make equally satisfactory

---

**25.** Curiously enough, claims 3 and 4 of the patent, unlike the other claims, refer to two shields. The specification, however, describes "a metal shield member," and in fact RCA's double charger has only one shield. It is unnecessary to rely upon this different terminology in claims 3 and 4, for it is clear in any event that SCM's double shield is in effect the same as RCA's.

prints, but, more important, the evidence discloses that SCM's device can make a good print when its shields are grounded in the same manner as RCA's. On all the evidence I find that the two devices are equivalent to each other. I conclude that if the 883 patent were valid, RCA would have a valid cause of action for infringement.[26]

### SCM's Second Count

SCM charges that RCA fraudulently induced SCM to accept a license under the 539 patent by means of intentional misrepresentations and intentional concealment of material facts. SCM seeks to recover all the royalties which it paid to RCA while this license was in effect, amounting to approximately $465,000. SCM claims to be entitled to recover these royalties either by way of restitution, on the theory that the license agreement was void *ab initio*, or as damages allegedly sustained by SCM by reason of RCA's fraud.

RCA originally challenged the jurisdiction of this court over this count. It withdrew its defense of lack of jurisdiction at the conclusion of the trial. I have considered the question and am satisfied that this count is sufficiently related to the first count to confer jurisdiction over it under the principle of pendent jurisdiction. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The facts relevant to this contention are comparatively few and with one exception are substantially undisputed. I find them to be as follows.

In April 1962 SCM announced to the trade that it would manufacture and sell copying machines. By the end of 1962, it was actively engaged in that business. At that time it did not manufacture its own coated paper but obtained it from a paper manufacturer, Plastic Coating Corporation. The zinc oxide used in the coating mixture on this paper was FGS 8.

As early as the fall of 1961, almost a year before the 539 patent issued, RCA advised SCM that the process claims in the 539 application had been allowed and suggested that SCM take a license under those claims. SCM did not do so at that time. After the 539 patent issued in September 1962, RCA intensified its efforts. In February 1963, it sent to SCM proposed license agreements under all three patents, the 539, 540 and 883. SCM was not interested in a license under the 540 patent or under the paper claims of the 539, because at that time SCM was not manufacturing a coated paper. SCM declined a license under the 883 patent in reliance upon the opinion of its patent counsel that SCM's double corona charger did not infringe that patent. Negotiations were limited, therefore, to the process claims of the 539. RCA was represented in these negotiations by Rodier, who was in charge of electrofax licensing. SCM was represented by its house patent counsel, Oppenheim.

Oppenheim was puzzled by the surface photoconductivity test referred to in the 539 patent. He did not know how to measure surface photoconductivity, nor did anyone else in SCM. At some point before the end of 1962, he asked Rodier about it. Rodier told him that the way to do it was to employ the test described in the DeVore affidavit which RCA had submitted to the Patent Office in September 1956. He gave Oppenheim a copy of the affidavit.

This affidavit did not help Oppenheim very much for SCM did not understand the DeVore measuring technique and did not possess the equipment necessary to employ it. Oppenheim considered it essential, however, to determine whether SCM's copy machine, using Plastic Coating Corporation's paper coated with FGS 8, would infringe the patent. This could only be determined by measuring the

---

26. I have not overlooked SCM's argument based on the doctrine of file wrapper estoppel, but I consider that argument to be without merit.

surface photoconductivity of FGS 8 by the DeVore method. Since SCM was unable to accomplish this itself, Oppenheim eventually asked Rodier to demonstrate the DeVore procedure by making a surface photoconductivity measurement of FGS 8 for SCM's benefit. Rodier finally agreed that RCA would assemble the necessary equipment to do so. This conversation between Oppenheim and Rodier occurred sometime before June 17, 1963.

On June 17, 1963, SCM signed a license agrement with RCA under the process claims 1–13, 20 and 21 of the 539 patent. The agreement was effective retroactively to March 1, 1963. No demonstration of the DeVore procedure had as yet taken place. Here we come to the only point in dispute on this branch of the case. Oppenheim testified that although he recommended to his superiors in SCM that SCM sign the license agreement, he did so in reliance upon an oral understanding which he had with Rodier that SCM would not pay royalties under the agreement until after the demonstration had occurred and SCM had been satisfied that FGS 8, when measured by the procedure described in the DeVore affidavit, had a surface photoconductivity of more than $10^{-9}$ ohms$^{-1}$/square/watt/cm.$^2$.

Rodier, no longer employed by RCA at the time of the trial, was not called as a witness, but his deposition was read in which he somewhat equivocally denied any such understanding. There is other evidence on the point which is to some extent conflicting. After reviewing all the evidence, I accept Oppenheim's testimony. I find that the oral agreement between him and Rodier was in fact made.

After some delay, the demonstration took place at RCA's laboratory at Princeton, New Jersey, on October 10, 1963. Oppenheim and Hanson, an SCM chemist, attended for SCM. Giaimo and an RCA licensing executive, Johnson, and perhaps Young as well, attended for RCA. Giaimo performed the demonstration, using equipment which was substantially the same as that described in DeVore's affidavit, although it differed in one or two respects which were concededly immaterial. Chopped light, with a chopping frequency of $23\frac{1}{2}$ cycles per second, was employed. The surface photoconductivity of a pellet of FGS 8 was measured. It turned out to be higher than $10^{-9}$. Both sides checked the computations and agreed that they were correct. Oppenheim was satisfied, as he testified, that "we came within the claims of the patent."

Thereafter SCM paid the royalties due from the effective date of the license agreement. It continued to pay royalties until it terminated the agreement by notice dated March 4, 1965. Prior to sending the notice of termination, Oppenheim attempted to persuade RCA to reduce the royalty rate by 50 per cent. RCA was willing to make some reduction, but not that much.

It is entirely clear from the evidence, and I so find, that Oppenheim asked for a demonstration of the DeVore technique and that that was what RCA gave him. The demonstration, except for immaterial details, was strictly in accordance with the procedure described in the DeVore affidavit. There is also no doubt that FGS 8 does have a surface photoconductivity higher than $10^{-9}$, and that SCM's machine, employing paper coated with FGS 8, does infringe the 539 patent. RCA did not misrepresent either the DeVore procedure or the measurement obtained by the use of that procedure.

SCM's principal claim of fraud is based upon the argument that the patent, as distinct from the DeVore affidavit, prescribed the test by the use of steady light and that therefore it was a misrepresentation on RCA's part to inform SCM that DeVore's technique, which expressly called for chopped light, was the procedure to be used. I reject this argument. The patent does not call for steady light. As is explained in the portion of this opinion dealing with the invalidity of the 539 patent under Section 112, the patent does not specify which type of light is to be employed. As I

have already found, this omission was presumably due to inadvertence, for it is clear from the Patent Office record that chopped light was always intended and there was no reason not to say so in the patent itself. Although this unfortunate mistake has relevance on the issue of Section 112, it has no bearing upon SCM's present charge of fraud. RCA was correct in informing SCM that the use of DeVore's chopped light technique was the proper way to determine the surface photoconductivity of the zinc oxide.[27]

SCM also suggests that RCA concealed material facts in that it did not inform SCM that the $10^{-9}$ criterion was wrong and that the number should have been $10^{-8}$. This contention impresses me as an afterthought conceived during the course of this litigation. I am not persuaded that it would have made any difference to SCM if it had been told that $10^{-8}$ was a more accurate number. FGS 8 has a surface photoconductivity of higher than $10^{-8}$, hence as far as infringement through the use of this particular zinc oxide is concerned, the result is the same whichever number is used. What SCM wanted was a demonstration of the measuring technique in order to ascertain whether the use of FGS 8 would infringe the patent. There is no doubt that SCM would have realized that this zinc oxide did infringe, even if it had been told that the correct criterion was $10^{-8}$.

■ Upon all the evidence I conclude that SCM has not proved that RCA procured the license agreement by fraudulent misrepresentation or intentional nondisclosure of material facts and that therefore SCM is not entitled to recover the royalties which it paid during the period when the agreement was in effect.

### SCM's Third Count

■ This is a treble damage antitrust action. SCM's complaint alleges that RCA "procured" the 539 patent by willful fraudulent representations and concealment of material facts and that by asserting the patent, it has attempted to monopolize and has monopolized interstate commerce in the electrostatic photocopy field, in violation of Section 2 of the Sherman Act. SCM alleges that it has been damaged by RCA's illegal monopolization and attempted monopolization "by having been wrongfully induced to pay" to RCA royalties in excess of $465,000 and by having incurred attorneys' fees and other expenses. Recovery is sought for treble damages in an unspecified amount.

This antitrust claim is predicated upon the doctrine of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), which held in substance that one who procures a patent "by knowingly and willfully misrepresenting facts to the Patent Office" may be guilty of a violation of Section 2 of the Sherman Act by enforcing that patent, provided that the evidence establishes the necessary "exclusionary power of the illegal patent claim in terms of the relevant market for the product involved." 382 U.S. at 177, 86 S.Ct. at 350. There are thus two elements which a plaintiff must prove in order to make out a claim under this doctrine: (1) that defendant procured the patent by knowingly and willfully misrepresenting facts to the Patent Office, and (2) that defendant thereby secured the necessary exclusionary power in the relevant market. SCM has not proved either of these elements in this case.

As to the first, I have found that the 539 patent is unenforceable because of RCA's unclean hands in failing to be completely candid with the Patent Office. It is by no means clear that this is a sufficient knowing and willful misrepresentation of facts to constitute fraud within the meaning of the *Walker* rule.

---

27. Moreover, if steady light had been used, the measurement of the surface photoconductivity of FGS 8 would have been substantially higher than it was with chopped light. Surely SCM would not have refused the license under those circumstances.

Indeed, in its brief, SCM appears to concede that it is not.[28] In any event, I have also held that SCM has not proved that RCA procured the patent as the result of its nondisclosure. Thus on this ground alone, the evidence is insufficient to establish a *Walker* claim.

As to the second element, the proof is also insufficient. The only evidence on this subject was elicited from an SCM planning executive who introduced two reports by market research organizations purporting to provide statistics on the various types of "convenience copiers" sold by various manufacturers during the period from 1960 to 1967. He also introduced an estimate prepared by SCM of the number of copies of documents, which run into the hundreds of millions, that are made annually by these machines. These statistics are necessarily estimates at best. Even taking them at face value, however, they do not establish monopolization by RCA.

In considering an issue of alleged monopolization, the first task is to define the market which is allegedly monopolized. SCM's complaint refers to the market as the "electrostatic photocopy field." This includes only two types of machines which operate on the electrostatic principle, machines employing RCA's electrofax process and the Xerox machine. In its evidence and in its brief, however, SCM necessarily has broadened the market to the "convenience copy market." This includes other types of machines manufactured and sold by Eastman Kodak, Minnesota Mining and Manufacturing Company, and others. These machines serve the same purpose and compete with electrofax and Xerox. They must therefore be considered as part of the relevant market.

On the basis of SCM's figures, electrofax enjoys only 20 per cent of that market. Xerox, on the other hand, has 67 per cent. RCA has always followed the policy of offering a license under its patents to anyone who wants one. Xerox, on the contrary, will not grant licenses to anyone. The same is apparently true of certain of the other manufacturers.

SMC's basic contention appears to be that without a license from RCA, it would be forced to go out of the copy machine business because other manufacturers would not grant it a license. This contention, assuming it to be true, obviously does not prove that RCA has monopolized the convenience copy market. On the evidence, RCA's share of the total market is not large enough to establish monopolization or an attempt to monopolize under the *Walker* doctrine. I conclude that SCM has not proved the claim asserted in its third count and is not entitled to relief under that count.

## Conclusion

SCM is entitled to judgment declaring:

(1) that the 539 patent is unenforceable because of RCA's unclean hands and that it is invalid under Section 112;

(2) that the 540 patent is invalid under Sections 103 and 112;

(3) that the 883 patent is invalid under Section 103.

The judgment may contain appropriate provisions enjoining RCA from enforcing the patents as against SCM.

RCA is entitled to judgment dismissing SCM's second and third counts on the merits.

Under the circumstances of this case, counsel fees will not be allowed to either party.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Settle judgment on notice.

---

28. The brief states:

"If, however, the Court should find that RCA's conduct amounted to unclean hands, but did not constitute intentional fraud on the Patent Office (though we strongly urge it was) then, while the antitrust relief sought would therefore be denied, SCM would be entitled under 38 U.S.C. § 285 to its reasonable attorneys fees and expenses with respect to this entire case."